## YARBROUGH v. GREAT AMERICAN INDEMNITY CO. *

### No. 4968.

Court of Appeal of Louisiana.
Second Circuit.
March 8, 1935.

E. W. & P. N. Browne, of Shreveport, for appellant.

Harry V. Booth, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff, while performing the duties of his employment to his brother, Sam N. Yar-

---

*Rehearing denied April 3, 1935.

brough, engaged in the business of excavating and dredging, sustained a serious injury to his left hip joint and to the upper part of the femur of the left leg. He was paid compensation by the Great American Indemnity Company, the employer's insurer, from May 7, 1933, to April 10, 1934, forty-nine weeks, at the rate of $9.75 per week, being 65 per cent. of his weekly wages when injured, but further payments were refused. This suit was then filed against the employer and the insurer company to recover compensation at the rate of $20 per week for four hundred weeks, less the amounts previously paid him. The basis for this demand for increase in amount of compensation payments is that until a short time prior to the accident plaintiff's wages equaled $35 per week, and that he is totally and permanently disabled to perform work of a reasonable character.

Defendant Yarbrough answered, but thereafter made voluntary surrender in bankruptcy. A stay motion filed by him was sustained. He passed from the case.

The insurer filed a plea of estoppel against plaintiff's demand for compensation in excess of the rate paid to and accepted by him for nearly one year, alleging that by accepting such payments he thereby acquiesced in, ratified, and admitted said payments to be correct and proper. This plea was by agreement referred to the merits without prejudice. The insurer's answer is a general denial, with these exceptions: That plaintiff was injured on May 7, 1933, while working for the insured, and that prior payments of compensation to him on basis of temporary disability were made to him. It further pleads, viz.:

"Further answering, respondent shows that it is informed and so alleges, that the said plaintiff could correct all of his injuries and disability by an operation removing the bony protrusion, and that after said operation has been performed, he should have entirely recovered within 90 days thereafter, and therefore in no event is respondent indebted unto petitioner in any further sum than for compensation up to and including July 11, 1934, as for temporary disability.

"Shows further, in the alternative, and only in the alternative, should the court hold that plaintiff is entitled to compensation for a greater period of time than as above set out, then and in such event, he should be limited to compensation as for the loss of a leg, or for a total of 175 weeks at $9.75 per week from date of accident; and in no event should he recover more than 300 weeks as for temporary total or partial disability."

And, finally, it pleads in the alternative that should any further compensation be recovered by plaintiff, due credit for the amounts paid him, a total of $477.75, should be given it, as well as for $283 for hospital and medical bills paid for his account. The prayer of the answer is in consonance with the above quoted and paraphrased allegations.

There was judgment for plaintiff for four hundred weeks at the rate of $9.75 per week, less payments previously made to him.

A motion for new trial was filed, based upon the bare averment that the judgment was contrary to the law and evidence in the case. This motion was supplemented by another one, wherein it was specifically urged that a new trial should be granted and the case reopened to afford mover "the right to make a legal tender of an operation by a competent medical expert, to plaintiff, or the price of same." It is alleged in this supplemental motion that it was established on the trial that a surgical operation on plaintiff was necessary to relieve his condition and that same would not be a serious one, from which he would fully recover after five months, and be able to do the same work he did do when and before he was injured. It was further averred that no operation was tendered in open court, when the case was tried, because plaintiff had refused to submit to one before the trial and reiterated such refusal during trial, and a tender would have been vain and idle; and, further, that mover's conception of the law and jurisprudence existing at the time of filing its answer was such that it believed that such an operation would not be ordered, even in the alternative, but that since filing said answer the Court of Appeal, Parish of Orleans, in the case of Crawford v. Tampa Inter-Ocean S. S. Co., 155 So. 409, had held that where an operation is tendered, and if performed it would not be attended by grave danger, in fact would not be a serious operation, the injured employee must submit thereto in order to minimize compensation. These motions were overruled, and defendant appealed to this court.

Plaintiff and his brother, defendant, were engaged in "jacking up" a heavy drag line so that it could be shoved onto a flat car. One of the jacks slipped in some manner, and to avoid being crushed or otherwise maimed from the falling drag line, plaintiff and others there hurriedly sought safety. He was run against or into by one of the laborers and knocked down and onto a pile of brick nearby and received the injuries ulti-

mately producing the cause of disability of which he complains. The base of the femoral neck was fractured, accompanied with a tearing loose and displacement upwards for one and one-half inches of the lesser trochanter. The ligaments, muscles, and tissues about the joint were also injured. The fractured neck was reduced, and at time of trial there was firm union thereof without any displacement or deformity. The lesser trochanter, however, in the words of Dr. Durham, "remains in same position (after being displaced) and has become strongly united to the shaft (femur) by an elongated spur of bone about one half inch in diameter." It is one and one-fourth inches long. Dr. Durham, in his report, further says of this bony spur:

"This abnormal bone formation or exostosis has evidently formed in the torn periosteum which remained attached to the femoral shaft and displaced lesser trochanter. This bony exostosis is the probable cause of the occasional pain of which the claimant complains, since it is in very close apposition to the ischium and may, when the leg is forcibly adducted, impinge against it."

Plaintiff was taken to a sanitarium immediately after being hurt and remained there, in a plaster paris cast, for six weeks. He was confined to his bed at home for sixty more days, and following this experience he went about with the aid of crutches for another sixty days. When the case was tried (June 15, 1934), he complained of a stiffness and soreness in and about the hip joint, which was aggravated by standing on his legs for long intervals and by walking. He was unable to stoop over and lift heavy weights without experiencing pain about this joint, and when he makes an awkward step, or the left leg is forced to extreme ranges, the pain is more severe and acute. There is also some weakness in the power of flexion of the left thigh. These pains and lack of flexion, Dr. Durham is of the opinion, are due to the bony exostosis impinging against the lower dorsal part of the innominate bone, called the "ischium." This reasoning, in view of the juxtaposition of these bones, appears to be sound. The unnatural exostosis pressing into and against the flesh around it and against the ischium, it seems, should produce the pain and discomfort of which plaintiff complains. He has not the function of the leg necessary to perform hard manual labor.

Plaintiff is 52 years of age, and prematurely old in appearance. He was a foreman in his brother's working organization, but performed heavy work himself. His duties required him to be on his feet nearly all the time. It was also his duty to keep the time of the laborers under him. It is not shown what other line of work, if any, he ever followed. It is shown that he is now incapable of performing the duties he was performing when injured. His physical condition is such that he cannot actively get about to that extent necessary to satisfactorily discharge such duties. Dr. Durham, whose ability as an orthopedic surgeon is generally recognized, was the only expert to give evidence in the case. His status as a witness in the case, it is conceded, is as though he had been selected by the court to examine plaintiff and make report of his findings. Of plaintiff's present condition and the result of an operation to remove the exostosis, he says:

"In his present condition his disability I believe would amount from 40 to 50% for general labor. The exostosis can be removed and under average conditions he should have no permanent disability. It would probably require in a man of his age five or six months to make complete recovery from such a procedure."

The questions before us for decision, arising from the issues in the case, are correctly stated in defendant's brief, viz.:

1. Extent of disability;

2. Classification under which plaintiff's disability should apply, provided an operation is not ordered;

3. Amount of wages earned at time of accident; and

4. Right of plaintiff to refuse tender of operation on the motion to remand, and prior tenders made.

We shall discuss and pass upon these questions in inverse order.

Plaintiff, while testifying, stated positively he would not voluntarily submit to an operation to relieve the cause of his present disability, viz., the bony protrusion from the femur of left leg. Dr. Durham is of the opinion that such an operation would result in complete restoration of the leg's functioning, but that in view of his age as early result would not be secured as would be expected if he were younger. The nature and extent of the operation is described by Dr. Durham as follows:

"A. Well the operation would consist in removal of the bony spur which is about an inch and a quarter long and transferring the muscles attached from the end of the spur to the normal position on the shaft of bone— it would probably necessitate his laying up

about six weeks and probably take another six weeks for him to regain complete function so he could work.

"Q. Six weeks or six months? A. Six weeks to recover from the operation, another six weeks to get function back, three months, then allow another two months for temporary disability.

"Q. Necessarily be some discomfort in having an operation of this character? A. Yes, there would be for probably twenty-four or forty-eight hours."

■ To accomplish this operation the flesh of the femur about the exostosis would have to be laid wide open to the bone by the surgeon's knife, while the patient is completely under the influence of anæsthetic. From the viewpoint of a seasoned surgeon such an operation is not considered serious, but to the lay mind a different opinion is obvious. No good purpose would be served by extended discussion of this question. We shall dispose of it by quoting from and concurring in the very cogent reasons assigned by Judge Bell of the lower court, in denying the motion for new trial, viz.:

"While we are undoubtedly of the opinion that the plaintiff in the present case should submit to such an operation for his own benefit and the benefit of society, in order to make him a useful member of that society, yet we cannot reach the conclusion that under the jurisprudence as set forth in our local circuit that this court has the right to render even an alternative judgment ordering such an operation.

"The question is discussed quite fully in this circuit in the case of Martin v. Wyatt Lumber Company, 4 La. App. 157, in which case Judge Odom as the organ of the Court used this language; which is just as pertinent to the present kind of operation as it was to that: 'Furthermore we cannot close our minds to what we know to be the opinion and experience of eminent surgeons of great learning and years of actual practice along this line.'

"While the testimony along this line is furnished by Dr. Durham alone, and his testimony is to the effect that the operation is not a serious one and should be successful, yet in the language of Judge Odom, we cannot close our minds to the fact that any operation which will involve the laying open of the thigh, the cutting off of a piece of bone, and attaching the ligaments and muscles to the bone, is bound to be attended with considering suffering and danger."

This question is discussed lucidly and at length in Crawford v. Tampa Inter-Ocean S. S. Co., Inc. (La. App.) 155 So. 409, 413. The court there held:

"We conclude, therefore, that though, in certain cases, it may be reasonable to require an employee to submit to an operation for a simple hernia, nevertheless, in the instant case, by reason of the fact that there was some danger of fatal result and that a first operation had been unsuccessful, the injured party's refusal to submit to an operation was not unreasonable."

We do not think this decision, when the facts are considered, to any material extent conflicts with our present holding.

■ Before the depression's full force gripped the parts of the country in which plaintiff worked, he earned regularly $25, and more, per week. During the depression he has worked irregularly, intermittently, at the daily wage, or approximately so, he received prior thereto. His brother took the contract, which was being fulfilled when he was injured, at a very close figure, and to give employment to plaintiff and other workmen of his organization, he offered them reduced pay of $2.50 per day, but for a six-day week, with the understanding that the profits from the contract would be divided. There were no profits. Therefore, whatever compensation plaintiff is entitled to recover in this case must, under subsection 3 of section 8 of the Workmen's Compensation Law, as amended by act No. 242 of 1928, p. 361, be based upon the daily wage being paid him under the contract of hiring when the injury occurred, without reference to the rate of wages paid him when economic conditions were more favorable. Rylander v. T. Smith & Son, Inc., 177 La. 716, 149 So. 434, and cases therein cited; Durrett v. Unemployment Relief Comm. (La. App.) 152 So. 138; Young v. Unemployment Relief Administration (La. App.) 154 So. 642.

■ The testimony, we think, discloses that plaintiff has not lost the use of the left leg; but for the exostosis, at the present situs of the lesser trochanter, extending toward the ischium, the functioning of this leg would be virtually normal. The effects of the original trauma to the joint and femur neck had practically disappeared before the case was tried. Therefore, plaintiff's right to recover cannot be determined on the basis of total loss of use of the leg. Other provisions of the Workmen's Compensation Law will have to be resorted to in order to fix the quantum of

442

compensation due him. The lower court held that plaintiff's disability was total and permanent, and awarded compensation under paragraph (b) of subsection 1 of section 8 of the Workmen's Compensation Law (Act No. 242 of 1928, p. 357), which in effect was to hold that the disability prevented him from performing work of any reasonable character. In this connection, the most serious difficulty we have to contend with is whether the disability is partial or total. The cause of the disability, according to Dr. Durham, may only be removed by operation, and that depends entirely upon the volition of plaintiff. This being true, it is obvious that it is of a permanent character. Dr. Durham was of the opinion at date of trial that plaintiff's disability would amount from 40 per cent. to 50 per cent. for general labor, but added that he could not tell how much pain or discomfort he would experience while endeavoring to do hard labor; that "one man might work with a lot of pain and another won't; I cannot tell." It is clearly shown that he is incapable, because of the disability, of performing the line of work he was engaged in before being injured. He has tried to do so, but failed. The amount of the wages he drew when times were good indicates that he was not a skilled workman, but one who depended upon manual labor, largely, in the discharge of his duties. As stated before, it does not appear that he is competent to earn a living, in whole or part, by the pursuit of any other sort of work.

It is not in keeping with the spirit and philosophy of the Workmen's Compensation Law to say that an injured laborer is not totally disabled to do work of any reasonable character, under its provisions, because he may be able to do some sort of work, even though in doing so physical pain and discomfort rack his body or some of its members; and, as in this case, where it appears that by performing the sort of labor plaintiff was performing as an avocation when injured, the pain and discomfort is increasingly aggravated, it would be a traverse of the humane spirit of that law to say that he is not entitled to the maximum of compensation provided by it. We think plaintiff's condition should be regarded as one of total disability to perform the character of work he followed when well, or to perform work of any reasonable character. It may be he could perform, in whole or part, the duties of a position wherein only light or inactive effort is required, but where are such positions obtainable? Industry is not looking for men who are only able to do light work. Legions of them, able to do a strong man's work, are unemployed and seeking to do honest labor.

In Knispel v. Gulf States Utilities Co., 174 La. 401, 141 So. 9, 10, it was held that:

"Employee's disability should be deemed to be 'total disability' within statute whenever it appears that employee, due to injury, is unable to perform work of same or similar description that he was accustomed to perform (Act No. 242 of 1928, p. 357, § 8, subsecs. a, b)."

This case has been followed in other decisions and is now accepted as authority on the principle covered by the above quoted syllabus.

Judgment appealed from is affirmed.