DAVIS v. TRANS–AMERICAN CONST. CO.
et al. *
No. 5042.

Court of Appeal of Louisiana.
Second Circuit.
May 2, 1935.

Irion & Switzer and Henry F. Turner, all of Shreveport, for appellants.

T. Overton Brooks, of Shreveport, for appellee.

TALIAFERRO, Judge.

Plaintiff brings this suit to recover compensation for alleged permanent total disability. There is but one controverted issue in the case and that is the extent of the disability. Plaintiff contends that it is total and permanent, while defendants, his employer and its insurer, Globe Indemnity Company of New York, contend that the disability, when the case was tried, was only partial, conceding that it is 25 per cent.

It is not denied that plaintiff on February 17, 1934, while performing the duties of his employment, was seriously and painfully injured. He and other workmen were on the ground engaged in handing pieces of lumber up to some workmen on a scaffold about 12 feet high. A piece of water soaked pine timber, 4x4 inches, and 7 feet long, was found to be slightly too short. A workman threw it from the scaffold. Its course was deflected by contact with an electric wire and, falling end downward, struck the left side of plaintiff's forehead near the hair line. The blow knocked him to the ground, in an unconscious condition. A gash 1½ inches long was cut in the skin. Two or more fellow workmen picked him up, carried him to defendant's office, and from there he was sent to Dr. Boone's office for medical and surgical attention. Six stitches were taken to close the wound and X-rays were made of the left side of the head. He was then carried to a sanitarium in the city of Shreveport where he remained for three days, and then went to his home. The following day he became so dizzy and sick that he was forced to bed. He says he could hardly "wiggle." His physician, being advised of these facts, had him returned to the sanitarium where he remained for eleven days additional. After being discharged from the sanitarium the second time, he returned to his home in Shreveport, remained there a few days, and then, with his wife and one small child, moved to Coushatta, La., from which time to the trial of the case, October 30th, he has lived with some member of his or his wife's people, and has been unable to do manual labor, the only kind of work he has known and which he theretofore pursued for a livelihood. He was, not treated by any physician for his ailments during this time, excepting spinal punctures hereafter mentioned.

Plaintiff's evidence, corroborated by that of lay and medical witnesses, is to the effect that he has headaches regularly, dizzy spells, especially when exposed to the sunshine, stoops over or raises up quickly. Such symptoms are expected to manifest themselves in serious head injury cases. These dizzy spells occur also when he becomes too warm and are accompanied by temporary impairment of eyesight. He is also bothered with excessive bleeding of the nose, and complains of aches in his shoulders and hips. He regularly worked ten hours or more daily at hard labor, Sundays not excepted. When injured, he weighed 146 pounds, was 21 years old, strong and vigorous physically. From that time on he declined physically. At the date of trial he weighed 122 pounds and had the appearance of being undernourished.

It is the theory of plaintiff that the blow to his head fractured the skull bone and caused such compression of the brain as to

produce oedema, which means effusion of fluids into the connecting tissue of the brain; that the fluid, being confined between the bony walls of the cranium, was absorbed into the soft tissue and finally made its way down the spinal canal.

Defendants take issue with both of these contentions, urging that the proof in the case does not support either.

There is uniformity of contradiction and differences of opinion between the doctors, technicians, and radiologists of both sides, respectively, exceeding that usually observed in such a case.

Dr. Alverson, who closely examined the plaintiff five times between May 1st and October 30th, was positive in the opinion, based upon the history of the case, subjective and objective symptoms, that he had oedema of the brain and spinal cord. Pressure of liquid against the brain and cord, he thought, caused the spells of dizziness, vertigo, nervous condition, etc., with which plaintiff is affected; also ascribed to this pressure the frequent bleeding of the nose. On May 2d, he and Dr. Herold made a puncture of plaintiff's spine. They agree that this operation disclosed an abnormal pressure against the cord. They differ as to the gravity of the pressure. The patient's blood pressure then registered considerably more than it should for one of his age. Dr. Alverson is positive there existed causal connection between this condition and the injury to the head. Dr. Herold, to some extent, corroborates him in substance, saying, "Sometimes it (high blood pressure) will give a clue as to whether there is any increased pressure in the central nervous system. It is not positive evidence." He also stated that the eye revealed congestion "which is suspicious of some increased pressure in the head."

The technicians who made laboratory analyses and examinations of the fluid taken from the spine differed in their findings. The one who examined the sample taken by Dr. Alverson found positive evidence of excessive number of red blood corpuscles therein, while the technician who analyzed the sample given her by Dr. Herold found only one blood cell therein, which was not unusual. The presence of an excessive amount of red blood cells in the spinal fluid seems to indicate that there was traumatic injury to some part of the brain. Dr. Herold did not think there was oedema, but admitted that plaintiff originally had a serious head injury. He agreed with Dr. Alverson that draining of the spinal canal at regular intervals, once or twice a week, would have been the proper treatment for plaintiff, and stated that because that had not been done, recovery had been retarded. He was unable to state definitely the time it would have required for normal condition to be restored, even had this sort of attention been given plaintiff. Some cases, he said, would respond in a few weeks, while others required many months. The nature of the injury, of course, would naturally affect the time for recovery. Where such treatment is not promptly resorted to, recovery is not expected as quickly as if it had been. Other punctures of plaintiff's spine were made. These disclosed the same conditions as that made by Drs. Herold and Alverson.

Dr. S. C. Barrow, a radiologist of nearly thirty years' experience, made X-ray pictures of plaintiff's head on June 8th. These disclosed a thread-size linear fracture of the right frontal bone extending from about the coronal suture forward, a distance of from 1 to 1½ inches. He was certain the fracture extended through both exterior and interior tables.

Dr. Oscar O. Jones, a roentgenologist of seventeen years' experience, X-rayed plaintiff's head on June 9th. His pictures did not disclose any fracture at all. When presented with the pictures made by Dr. Barrow, he stated they disclosed no fracture. He said: "In my opinion that is not a fracture because there is no dissolution in the bone continuity. This line probably may have been a defect in the screen. We have intensifying screens that we use in those cases that shorten the exposure time. They sometimes get defects in them and that would cause the line."

Dr. Edwards, who also X-rayed plaintiff's head, was certain his pictures disclosed no fracture. He thought the line Dr. Barrow interpreted as a fracture in the pictures made by him was simply the blood vessels coursing through the bone of the skull.

It is shown that ordinary fractures of the skull bones are not serious and do not affect the functioning of the brain. It is necessary, that there be pressure against the brain to affect its functioning to any material extent. We do not understand, however, from the expert testimony in this case, that it was at all necessary that the blow to plaintiff's head be sufficient in force to fracture the skull, in order to produce the oedemic condition found by Dr. Alverson, but that such result could follow a heavy blow not sufficient to cause fracture.

If plaintiff's skull was not fractured from the effect of this large and heavy piece of lumber striking it endways, after falling 10 or 12 feet, he has cause to felicitate himself over the near escape.

Several other medical experts gave testimony which substantially supports that given by Dr. Herold, a witness for defendants. All of them agree that plaintiff is to some extent disabled and all agree that the blow to his head caused the disability. They are equally in accord that his case needs specific treatment and lean to the conclusion that if such treatment is administered, he will eventually recover, though Dr. Herold is not absolutely certain a complete cure will result.

Plaintiff is either totally disabled to perform manual labor, within the law's meaning, or else he is a malingerer of the rawest type. If he is guilty of malingering, then several of his and his wife's kinsmen are particeps to the offense. We are not at all impressed that these people have perjured themselves.

Every symptom and ailment plaintiff complains of may be attributed to serious head injury. The doctors all agree on this. They all agree that he is totally disabled to perform hard labor in the sunshine, but think he could do so in the shade, or under some protection from the sun's rays. They agree it would be hazardous for him to work at all above the ground, or to climb.

A laborer rarely has any choice as to location or quality of the work he is engaged to do. He must be able to do work in the sunshine or shade, when required, and climb where such becomes necessary in the line of his duties. He has not the power of election in these respects. See Yarborough v. Great American Indemnity Co. (La. App.) 159 So. 438, 442, for discussion of disability therein involved. We there quoted from Knispel v. Gulf States Utilities Co., 174 La. 401, 141 So. 9, 10, as follows: "'Employee's disability should be deemed to be "total disability" within statute whenever it appears that employee, due to injury, is unable to perform work of same or similar description that he was accustomed to perform (Act No. 242 of 1928, p. 357, § 8, subsec. [1] a, b).'"

The present case falls squarely within this doctrine.

Defendants paid plaintiff compensation, based on total disability, to June 6, 1934, at the rate of $16.38 per week, and thereafter reduced the payments to $4.10 per week, as in case of 25 per cent. disability. It is not disclosed why defendants did not require plaintiff to submit to medical and surgical treatment, at their expense, to relieve his condition, which, it is fairly well conceded, may be wholly relieved by proper treatment. His own financial condition was such as to forbid him having the spinal punctures made as often as was necessary to relieve the pressure against the cord. It is not shown that he refused to submit to any treatment tendered by defendants.

There was judgment for plaintiff for compensation at the rate sued for by him, less amounts paid on that account, during total disability, not to exceed 400 weeks, and for $250 to cover medical treatment and hospital expenses, and costs of suit. Defendants appealed. For the reasons herein assigned, we are of the opinion this judgment is correct and it is hereby affirmed.