**STIEFFEL v. VALENTINE SUGARS, Inc., et al.**

No. 1725.

Court of Appeal of Louisiana. First Circuit.

June 30, 1937.

Henry & Kelleher and A. M. Suthon, all of New Orleans, for appellants.

Hugh M. Wilkinson, A. Miles Coe, and Harry Nowalsky, all of New Orleans, for appellee.

OTT, Judge.

Plaintiff sues for compensation in the total sum of $5,227.95 for total permanent disability, that is for 65 per cent. of his weekly wage for 400 weeks. The suit is against the Valentine Sugars, Inc., his employer, and the National Casualty Company, the insurance carrier. Plaintiff was awarded compensation for 400 weeks at $13.65 per week, subject ·to a credit of $235.95 for compensation already paid. The defendants have appealed.

We think that the following facts may be taken as true from the pleadings or from the testimony in the record:

While riding in a Ford truck October 25, 1934, on a mission for his employer, plaintiff sustained an injury to his right hip when the truck in which he was riding collided with an automobile, causing a dislocation upward and inward of the head of the femur, a large chip fracture of the upper portion of the acetablum (hip socket), and a small chip of the lower portion. Plaintiff was in the hospital for 23 days,

and was regularly treated by a doctor until February 25, 1935, at which time he went back to work for the employer as stenographer and clerical worker in which position he worked until January 11, 1936, receiving for this period the total sum of $797.65, including an allowance for board. At the time of his injury he was receiving $21 per week, and was paid compensation for slightly over 17 weeks at $13.65 per week plus hospital bills.

Plaintiff's right leg is one-half inch shorter than his other leg, causing him to walk with a limp. In walking, he uses a stick part of the time, but at times walks without a stick. The occupation which plaintiff is equipped to follow is that of stenographer and clerical work. He worked in that capacity for several different employers before his injury, but since his injury has worked for no other employer except Valentine Sugars as stated above. He has made application to several firms for work since the accident, but has been unable to secure work, one prospective employer indicating that plaintiff might not be able to get around the office to do the work, and another telling him that they were not in need of any more help. Defendant Valentine Sugars, Inc., offered plaintiff a position on September 12, 1936, similar to the one he had before, which plaintiff first agreed to accept, but later declined for the reason that he had prospects of getting a permanent position, but which turned out to be what he calls a "dud," meaning, as we understand it, that he did not get the job.

According to the testimony of three men connected with the Valentine Sugars and for whom plaintiff worked during the period from February 25, 1935, to January 11, 1936, he performed just as efficient and just as satisfactory work as stenographer after the injury as he did before. They admit, however, that he was not as active and could not get around in the office quite as well as he did before, and that part of the time he used a cane in walking around the office.

Plaintiff states that he was employed before the accident as file clerk, stenographer, and clerical worker; that after the accident he performed practically the same duties. He adds: "But I couldn't do all the work I did before the accident, for instance, if they had an adding machine to be moved from one place in the office to another, I had to get Mr. Gaubert (a clerk in the office) to help me move it, and if I wanted to stoop down and lift up something he had to do it for me." He further testified that when he sat down for an hour or two his hip would hurt him and he would be forced to arise from his position.

It is claimed by the employer, defendant, that plaintiff was discharged on January 11, 1936, not because of any dissatisfaction with his work, but because of a desire to give another young man a position who had been put through school by the company, and because the amount of work did not justify the company in retaining plaintiff at that time, it being the dull season for the company; that the company needed extra help when the grinding season came on in the fall and for that reason the offer was made to plaintiff to accept a position as clerk.

There is not a great deal of difference as to the nature and extent of plaintiff's injury, but the principal contention arises over the question as to the extent the injury incapacitates plaintiff from performing work similar to that in which he was engaged when injured and for which he is trained and equipped, as well as the particular part of the compensation law which is to control in fixing the amount of the compensation. Plaintiff contends that his injury affects his capacity to work in that he is unable to pursue the occupation for which he is trained and equipped, and that his injury is of a permanent nature, thereby bringing his case within the provisions of section 8, subsection 1, subdivision (b), Act No. 242 of 1928 (page 357) fixing compensation for total permanent disability at 65 per cent. of the weekly wage for a period not exceeding 400 weeks.

Defendants take the position in their answer that plaintiff's disability ceased on February 25, 1935, when he resumed his previous position and that compensation was paid him in full up to that time. They further allege in their answer that while plaintiff is able to do the same character of work that he did before the accident, and although he suffered a permanent partial impairment of some degree to his right leg, such impairment amounts to neither a permanent total nor a permanent partial disability, but amounts to a partial impairment in the usefulness of a physical function, covered by section 8, subsection 1 (d), paragraph 16, of Act

No. 242 of 1928 (page 358), and under this paragraph the court may allow such compensation as is reasonable and as is in proportion to the compensation provided for in cases of specific disability, not to exceed 65 per cent. of the wage during 100 weeks. But in their briefs defendants contend that plaintiff's compensation should be based on paragraph 15 of said section 8, subsection 1 (d), page 358, which provides for cases involving a permanent partial loss of the use of function of the member mentioned in the preceding paragraphs, where compensation is fixed in the proportion that impairment of the usefulness of the member bears to the total loss of the member; that as the medical evidence shows that the use of the right leg is impaired to the extent of 64.5 per cent. his compensation should be 64.5 per cent. of what it would be for the total loss of the leg, viz., 64.5 per cent. of 175 weeks, or 112.875 weeks at $13.65 per week.

The testimony of Dr. M. O. Miller, a medical expert, was taken for plaintiff. Dr. Miller first examined plaintiff on January 22, 1936, more than a year after the accident. He found plaintiff's right leg to be one-half inch shorter than his left leg; the right leg around the lower thigh was three-quarters of an inch less in circumference than around the left leg at the same point; and the circumference around the calf of the right leg was one-half inch less than around the left. The right leg is held abducted, or turned outwardly, to an angle of about 45 degrees. There is no internal nor external rotation of this leg, and a limitation of adduction or inward rotation. Dr. Miller concluded that there was an unreduced dislocation of the right hip. Dr. Miller made another examination of plaintiff with another doctor in November, 1936, at which time he had the use of recent X-ray pictures of the hip and in that examination he found that the head of the femur was resting in a newly formed acetablum, or hip socket, with no slipping out with weight bearing. During manipulation, the head of the femur remained firmly in this new joint. There was evidence of considerable erosion of the head of the femur and an enlargement of the acetablum. The doctor says that, while plaintiff may experience pain in the hip as he claims, yet the doctor thinks this pain will grow less and less. As to the disability to this leg, Dr. Miller concludes:

"An individual who received an accident to the right hip, sustaining a double fracture of the acetablum with a dislocation of the head of the right femur, which caused a tearing of the surrounding muscles, ligaments and capsules, and with the formation of the new joint cavity, with limitation of motion in certain directions, and a shortening of the extremity, I would consider that a permanent injury was done to the region of the right femoral articular processes."

Questioned on the ability of plaintiff to do stenographic or clerical work, Dr. Miller stated that he believed plaintiff is capable of doing such work, but if he had to run errands for fairly good distances, he would not be considered a first-class employee; that plaintiff could do more efficient work after he has become adjusted to his disability; and that the pain which plaintiff experienced while working after the accident is in no sense permanent, and should not be considered as a factor in determining the percentage of the loss of function of the leg.

Dr. Bradburn, an expert witness for the defendants, examined plaintiff alone and with Dr. Miller. The findings of these two doctors are so nearly the same that it is unnecessary to discuss the findings and opinion of Dr. Bradburn. Suffice it to say that in his opinion the injury to plaintiff's hip would not prevent him from performing the duties of a stenographer or clerical worker. Dr. Bradburn places the percentage of disability to the use of the leg at 64.5 per cent. This estimate is concurred in by Dr. Miller.

Dr. Jones, a witness for defendants, also testified that, in his opinion, plaintiff's injury would not prevent him from performing the work of a stenographer or clerical worker, nor would such work increase any pain in the hip.

Plaintiff admitted that he rode horseback one time; that he played tennis two or three times and danced some. He says that these activities caused pain in his hip and he could not continue this form of violent exercise.

Our conclusion is that the evidence shows that plaintiff is not incapacitated from doing any reasonable kind of work since his injury as he has and is now able to perform work similar to that which he was doing when injured. Most of the work of a stenographer is done with the

mind, the hands, fingers, and body movements and postures. What little walking and manipulations of the lower limbs may be required in this kind of work, we believe plaintiff can do. If he were a carpenter, a mechanic, a log-cutter, a painter, a ditch-digger, a farmer, a lineman, or if his means of earning a livelihood depended on any form of manual labor, we would have no hesitancy in reaching the conclusion that his disability affects his capacity to work and therefore his compensation should be controlled by subdivisions (a), (b), or (c) of said section 8, subsection 1 (page 357).

All of the cases cited and relied on by plaintiff were cases in which the disability of the employee affected his capacity to work as well as being disabilities affecting or impairing members of the body. The employees in those cases were dependent on the use of the injured member in the performance of the occupation by which they earned a living. We have read and carefully considered the recent case of Barr v. Davis Bros. Lbr. Co., Ltd., 183 La. 1013, 165 So. 185. The reasoning in that case, in our opinion, fully justifies the legal conclusions we have reached in this case. In that case the employee suffered an injury to his knee which totally incapacitated him from doing the kind of work that he was fitted to do and the court applied the disability paragraphs and permitted him to recover for total permanent disability, stating that the purpose of the compensation law is to provide funds for an injured employee to subsist on until he can return to work.

Likewise, in the case of Knispel v. Gulf States Utilities Company, Inc., 174 La. 401, 141 So. 9, the court allowed the employee to recover for total permanent disability because the injury to the employee's eye rendered him unable to perform his work of a lineman. In so far as his work was concerned, he was totally and permanently disabled. In Custer v. New Orleans Paper Box Factory, Inc., et al. (La.App.) 170 So. 388, the employee was a manual laborer and right handed; he lost his right arm and the court properly found that he was totally and permanently disabled from earning a living by the occupation for which he was fitted by his status, training, and education. The same situation existed in other cases where the same point was involved. Yarbrough v. Great American Indemnity Company (La.App.) 159 So.

438; Bell v. Employers' Liability Assur. Corporation, Ltd. (La.App.) 152 So. 766.

■ As plaintiff's disability does not affect materially his earning capacity and as he has not lost a limb or member nor the total loss of the use of a member whereby his compensation could be fixed at a definite amount under section 8, subsection 1 (d), he would be without a remedy were it not for paragraphs 15 and 16 of this section and subsection.

Paragraph 15 was evidently inserted to cover a situation where an employee suffers some permanent injury to a member which does not affect his capacity to work and where there is no loss of the member nor a complete loss of its use. In such case the employee is permitted to recover in proportion as the loss of use of function of the member bears to the total loss of the member, i. e., if the loss of use of function is 50 per cent., the recovery would be 50 per cent. of what it would be if the member were totally lost.

Paragraph 16 is inserted to meet another situation. Where the usefulness of a physical function is seriously impaired, but the injury does not affect the capacity to work and earn a livelihood, the court may allow such compensation as is reasonable and in proportion to the allowance for specific disabilities, not exceeding 65 per cent. of wages for 100 weeks. We believe plaintiff's claim properly comes under this paragraph.

It is shown that plaintiff before the accident was athletically inclined; he played basketball, baseball, and similar games. While he may be able to earn as much salary as he did before the injury, yet he will not be able to enjoy games, leisure hours, and ordinary comforts as he would have had he not been injured. Under the circumstances of his particular case, we think he should be given compensation under this paragraph for the full period of 100 weeks, which, after all, is less than he would get under paragraph 15 if we accept the estimates of the two doctors as to the disability in the use of his leg. But as we do not think, strictly speaking, the case involves the permanent partial loss of the use of a member as the injury is to the hip, only indirectly affecting the use of the leg, we think the compensation should be based on paragraph 16.

For the reasons assigned, it is ordered that the judgment be amended by reducing

the compensation allowed from 400 weeks at $13.65 per week to 100 weeks at $13.65 per week, calculated from October 25, 1934, less a credit of $235.95, already paid and to be credited on the first accruing installment, with legal interest on each past-due installment until paid; cost of the lower court to be paid by defendants, and the cost of the appeal to be paid by plaintiff-appellee.