This is an appeal taken by Maryland Casualty Company, the workmen's compensation insurance carrier of plaintiff's former employer, Higgins Aircraft, Inc., from a judgment in favor of plaintiff for 400 weeks compensation at the rate of $20 per week, commencing May 3, 1945 (subject to a credit of $692 for compensation previously paid,) and also for the sum of $40, representing medical expenses expended by plaintiff.
Plaintiff, Mrs. Charlie Bailey, divorced wife of Oliver Wactor, entered the employment of Higgins Aircraft, Inc., on November 9, 1943, and worked at various jobs until, on November 6, 1944, she was given the classification of assembler general A, at an hourly wage of $1.15.
On January 11, 1945, while performing her duties, which were hazardous, plaintiff slipped on some brown fluid located upon the floor of the aircraft plant and twisted her left knee. She was treated at the first aid station, and was later examined by Dr. Joseph T. Scott, Jr., who took X-rays and prescribed for her. She remained at home for about three days, then returned to her job as assembler general A at the same wage rate.
Plaintiff continued to work at the aircraft plant under said classification until May 3, 1945, when her services were terminated as the result of a reduction in the force of workmen. On May 4, 1945, plaintiff visited Dr. Scott, who sent her to the Touro Infirmary in New Orleans on May 8, where she underwent an operation to her knee the following day. Compensation was paid to her from May 8, 1945, at the maximum rate, until January 3, 1946, this period covering 34 3/5 weeks. Dr. Scott discharged her on January 3, 1946, his opinion being that she was able to return to work.
During the period for which plaintiff was paid compensation as aforesaid, Higgins Aircraft, Inc., closed its plant, and the job which plaintiff held became non-existent, and counsel for both parties concede that there is no like employment available in the vicinity of New Orleans, as there are no aircraft-building concerns located there.
After her discharge by Dr. Scott, plaintiff instituted this suit for total and permanent disability. Maryland Casualty Company, the defendant, resists the claims of plaintiff upon the ground that she had subsequently recovered from the injuries and was no longer disabled, and that no further compensation beyond that paid her is due.
Three medical expert witnesses testified in the case. Dr. Joseph T. Scott, Jr., who appeared for defendant, testified that plaintiff had been referred to him on January 11, 1945, and his diagnosis was that she had a twisted knee. When plaintiff returned to *Page 356 
Dr. Scott on May 4, 1945, after her services had been terminated at the aircraft plant, the doctor's findings were that she possessed a definite injury to the cruciate ligament of the left knee. Dr. Scott placed plaintiff in the Touro Infirmary on May 8, 1945, and on the next day performed an operation which disclosed that she had a dislocated cartilage, which he removed. The cruciate ligaments were found to be intact, with the exception of the median anterior ligament, which was torn. Dr., Scott testified that he repaired the ligament as well as possible,' but that "it is right difficult to make an entirely satisfactory repair of these ligaments." Plaintiff left the hospital on May 16, 1945, and continued to report to Dr. Scott's office from time to time until December 1945, for heat therapy and other treatment. Dr. Scott, while admitting that when he last saw her she had a ten to fifteen per cent disability, was of the opinion that she was physically competent to perform the duties of an assembler general A. Dr. Scott was asked upon cross examination if he had ever known of any cases were patients having injuries of the cruciate ligaments of the knee were able to return to work in airplane assembling plants. He stated that he knew of two cases where injured workmen having knee injuries had returned to their employment but admitted that they had injuries only to the cartilage of their knees, and not cruciate injuries.
Dr. Frank Brostrom, an orthopedic specialist, made examinations of plaintiff on October 8 and December 18, 1945, and during November 1946. Testifying as a defense witness, he stated that he found a ten to fifteen per cent disability in plaintiff's left knee. He admitted upon interrogation by the Court, that she would have some minor disability, and he was not certain whether she could stand for a full eight hour working day. It was his opinion that plaintiff's ability to stand should be tested by a return to her job. He thought that if plaintiff was not required to kneel or stoop in crouched positions, she could do her work "very well."
Plaintiff's medical expert was Dr. Lyon K. Loomis, who specializes in orthopedic surgery, and who examined her on March 1, 1946, and again on June 6, 1946. He found the left lower extremity to be one-half inch shorter than the right; that plaintiff had a 2 1/2 inch, well healed scar on the anteric-medial aspect of the left knee; that there was tenderness over the anterior lateral aspect of the lateral condyle of the left femur. His conclusions were that plaintiff showed a definite disability and was unfit for work requiring prolonged standing or walking, or work requiring the ascending and desending of stairways. He estimated the impairment of function in the whole extremity to be about twenty per cent.
At the time of the accident, plaintiff worked on a machine called a "jig," which was 30 feet long and stood 3 or 4 feet off the cement floor, used to drill holes with electric motors in the aluminum stringers that went into the manufacture of airplane wings. Plaintiff attempted to describe the jig, but her testimony is unenlightening as to the exact nature of this piece of machinery. In connection with her duties, plaintiff, at times, had to get beneath the jig in a crouched position, and she had to stoop, bend and crawl on top of the machine. It appears that the requirements were that plaintiff had to remain upon her feet at all times. About January 14, 1945, after the first treatment by Dr. Scott, she was placed on light work about the jig, and sat on a bench with her legs extended, interpreting blue prints for the benefit of other employees. She testified, and her testimony is uncontradicted, that she continued this light work until her termination on May 3, 1945. Plaintiff insists that since the accident she has continually suffered pains in her left knee, and that she cannot do any heavy work, and at the time of the trial below she described herself as being incapable of performing her usual household duties. She was employed at a gasoline filling station in Slidell, Louisiana, for a few days each week, sitting on a chair making out bills.
The opinion of Dr. Loomis is that the disability in plaintiff's knee would inhibit her from doing the work she had previously performed. Dr Scott was equally as certain that plaintiff could resume her usual duties, but admitted that he had never known of anyone who suffered a cruciate *Page 357 
injury to return to work afterward in an airplane manufacturing plant. Dr. Brostrom at first stated that he did not know whether plaintiff could stand a full eight hours constantly, and that the only way to determine her ability to do so would be to test her out. He afterward said he thought she might be able to do her usual work.
The evidence shows that the employees of Higgins Aircraft, Inc., were given two short rest periods during the working day, one in the mid-morning, and one in the afternoon. Defendant's counsel argue that with such rest periods, and the noon lunch period which was of one-half hour duration, it would not be necessary for plaintiff to stand during the full eight hours and that such rest would be beneficial to her and relieve the tension of constant standing. However, Dr. Brostrom is not certain whether plaintiff can return to her work, and Dr. Loomis is positive that she cannot.
During the course of the trial below, the court made two observations as to plaintiff's apparent condition, which are incorporated in the testimony. On page 26 of the testimony, we find the following statement by the court:
"The witness steps down from the witness platform one step at a time, putting her left leg down first and then bringing the right to the same level as the left, and then putting the left leg down again and bringing the right down to the same level."
On page 35, the following comment is found:
"Well, in order to clarify the record insofar as that demonstration is concerned, the Court might state that it particularly observed the witness when she made that demonstration, and she did keep her left leg in a straight position in descending the platform."
The evidence shows that on February 5, 1945, less than one month after the accident, plaintiff received a five cents an hour increase in wages, which was designated as a "merit award," and counsel for defendant argue that, had the plaintiff not been competent, such award would not have been received by her, and point to that circumstance as showing that she was laboring under no disability. However, the best answer to that contention is that Dr. Scott, defendant's physician, found it necessary to operate upon plaintiff's knee after her employment termination, and this clearly indicates that she did have some disability, otherwise the operation would have been unnecessary. And as to the merit award of five cents an hour, it would seem that this was a general increase given to all employees of the aircraft plant, as plaintiff's testimony clearly shows that she did much lighter work after her knee injury, and that her presence in the plant was due to the indulgence and toleration of beneficent superiors.
Counsel further argue that under no circumstances can plaintiff be placed in the category of a workman who is totally and permanently disabled, for the reason that the kind of work she performed when injured is no longer available in the vicinity of New Orleans, and that unless plaintiff can show that she made some attempt to return to work of the same kind, and was unable to perform the duties required due to her physical handicap, she cannot be considered as a disabled person within the purview of the Workmen's Compensation Act.
[1, 2] Considering the testimony of Drs. Scott and Brostrom, defendant's witnesses, to the effect that plaintiff showed some abnormality in the knee when they last saw her and which they each estimated to range from ten to fifteen per cent; the testimony of Dr. Loomis that it was twenty per cent and that she could not possibly do the work of an assembler general A; and also the testimony of plaintiff, which is absolutely uncontradicted, that she continues to suffer pain and is unable to stand for long periods of time, and cannot do her household work, stoop or bend, or climb and descend stairs, it is our opinion that plaintiff should be placed in the category of one who is totally and permanently disabled. The question is not whether the employment in which she was engaged when injured still exists, but whether her physical condition would permit the performance of the duties thereof. *Page 358 
[3] The trial court, who saw and heard the witness, believed that plaintiff was totally and permanently disabled. He also had the opportunity of observing her, and the statements dictated into the record indicate that it was his conclusion that she was laboring under disabling physical handicaps. These findings on factual matters, particularly where the veracity of witnesses is involved, should not be disturbed unless there is manifest error, and we fail to find any in the record.
[4] It is well established that a workman is disabled totally and permanently when he cannot, on account of his injuries, return to the work in which he was engaged at the time of the injury. Butzman v. Delta Shipbuilding Co., Inc., La. App.,21 So.2d 80; Stieffel v. Valentine Sugars, Inc., 188 La. 1091,179 So. 6; Yarbrough v. Great American Indemnity Co., La. App., 159 So. 438.
[5] In th case of Stieffel v. Valentine Sugars, Inc., supra [188 La. 1091, 179 So. 15], a stenographer suffered injuries to his hip which shortened his right leg one-half of an inch, and caused him to experience pain and to walk with a limp, thus impairing his ability to move about. The Supreme Court found that the workman was totally and permanently disabled, saying:
" 'Total and permanent disability from performing any work for compensation or profit does not require that insured become absolutely helpless, but merely requires such disability as renders him unable to perform substantial and material part of his occupation in usual and customary way.'
* * * * * *
"* * * In addition, it is satisfactorily shown that he is unequal to anything like reasonably constant physical activity in and about an office itself, where he is required to pass from room to room, handle chairs, typewriters, adding machines and their stands and supervise files that require frequent stooping and moving about, 'sitting down' for long periods and arising from a sitting to an erect position, all of which either provokes, or is accompanied by, more or less pain and discomfort, and has frequently to be followed by ameliorative treatment. 'Competency,' accompanied by active pain, amounts to disability."
[6] Counsel for defendant call our attention to the fact that after the injuries but before the operation, plaintiff worked for Higgins Aircraft, Inc., for a period of twenty weeks, at wages approximating those received by her before the accident, and contend that if the defendant is cast for compensation, due credit should be allowed at the rate of $20 per week for each of those weeks she worked. In the case of Daigle v. Higgins Industries, Inc., La. App., 29 So.2d 374, 379, we said:
"In short, we take the view that if, during that period for which compensation is due, the injured workman can earn a substantial living by working for the same employer at wages approximating those earned before the accident, the weeks for which he should earn such wages should be deducted from the 400 weeks during which compensation might otherwise be due to him."
Therefore, in addition to the credit allowed in the judgment for compensation already paid, the defendant is entitled to credit for $400, representing the twenty weeks during which she earned wages after the accident.
The lower court allowed plaintiff $40 for medical outlays, and there seems to be no complaint about this allowance. Plaintiff alleged in her petition that her medical expenses amounted to $500. There is, however, in the record, a stipulation agreed to by all counsel that the defendant expended $396.59 for such expenses.
For the reasons assigned, the judgment appealed from is amended so as to allow the defendant an additional credit of $400 and as amended the judgment is affirmed. Defendant-appellant is to pay all costs of this appeal.
Amended and affirmed. *Page 359