51 So.2d 393 (1951)
NEWSOM
v.
CALDWELL & McCANN.
No. 3359.
Court of Appeal of Louisiana, First Circuit.
March 15, 1951.
*394 Hirsch, Greene & Barker, Baton Rouge, for appellant.
Watson, Blanche, Fridge, Wilson & Posner, Baton Rouge, for appellee.
DORE, Judge.
After a rehearing had been granted to plaintiff, counsel for defendants filed a motion to recall and set aside the rehearing on the ground that the application had not been timely filed. The pertinent dates are as follows: On November 22, 1950 judgment was rendered by this Court affirming the decision of the lower court and denying plaintiff's claim; notice of this decision was mailed by registered mail, in accordance with the rules of this court, on the 23rd of November, and was delivered to and received by counsel for plaintiff on November 24th; on December 8th the application for rehearing was filed, and the rehearing was granted on December 22nd.
Prior to adoption of the Revised Statutes of 1950 the manner of computing the delays within which an application for rehearing by this Court could be filed had been established. Act No. 16 of 1910, Darts', Sec. 1450, provided that: "Judgments rendered in the courts of appeal * * * shall become final and executory on the fifteenth calendar day after the rendition * * *; provided that in the interval parties in interest shall have the right to apply for rehearing; * * *."
The State Constitution, Article 7, Section 24, provided that: "Notice of all judgments shall be given to the counsel of record; and the court shall provide by rule for the giving of such notices. No delays shall run until such notice shall have been given." (Emphasis supplied.)
In Lacaze v. Hardee, 199 La. 566, 6 So. 2d 663, 665, the Supreme Court, correcting an erroneous decision by the Court of Appeal, Second Circuit, in the same case but reported in 7 So.2d 719, said that the above provision of the Constitution as interpreted by the Supreme Court meant "that the day on which counsel of record receives the notice of the judgment is excluded in computing the fourteen days that the litigant has in which to apply for a rehearing." To the same effect see Dambly v. Duconge, La.App., 5 So.2d 152, and Tyson v. Baker, La.App., 12 So.2d 468.
Under those authorities the application herein was filed timely since it was filed on the fourteenth day after notice of the judgment was received by counsel. But defendants argue that adoption of the Revised Statutes of 1950 repealed Act No. 16 of 1910 and overruled existing decisions of the courts. LSA-RS 13:4446 reads as follows:
"Applications for a rehearing in all of the courts of appeal * * * must be filed:
"On or before the fifth calendar day after the rendition of judgment by the court of appeal for the parish of Orleans in all cases appealed from the city courts of New Orleans; or,
"On or before the fourteenth calendar day after the rendition of judgment by any of the courts of appeal in all other cases."
Defendants' argument has no merit for several reasons. First, the Louisiana State Law Institute, compiler of the Revised Statutes, had no authority to write any new law. Act No. 43 of 1942, LSA-RS 14:1 et seq., instructed the Institute to *395 prepare a comprehensive revision of the statutes, simplify their language, and reduce them to one connected text. When the report of the Institute was adopted by the Legislature in 1950 it was expressly stated in Chapter 1, Section 16, that "The Louisiana Revised Statutes of 1950 shall be construed as continuations of and as substitutes for the laws or parts of laws which are revised and consolidated herein." Thus it is evident that there was no intent on the part of the Legislature to change the existing law fixing the time for asking for rehearings. And in the second place, the Legislature even if it so desired could not have changed the law as defendants claim, since such a change would have violated Article 7, Section 24 of the Constitution as interpreted by the Supreme Court.
In addition to these reasons, we feel that when defendants filed an answer to the application for rehearing, on December 13, 1950, they waived all right to later object to the timely filing of the application. C.P. art. 327. Motion denied.

On the Merits
At our first hearing of this claim we upheld the judgment of the trial court dismissing plaintiff's suit for the reason, primarily, that we had concluded that plaintiff did not prove to a sufficient degree of certainty that his injury had rendered him incapable of doing the same work that he had done prior to his injury or work comparable thereto.
In defendants' brief on rehearing counsel has discussed each of the cases cited by plaintiff on rehearing and, by showing the different factual situations in those cases from the present case, has shown that those cases are of doubtful value in supporting plaintiff's claim. There is no need now to elaborate on those cases.
There are two well fixed rules to be followed in deciding such cases as this. First, each case must stand or fall on its own merits. Second, if plaintiff received an accidental injury on the job and it rendered him incapable of continuing in the same or similar work then he is, under our jurisprudence, entitled to total disability benefits. See Barr v. Davis Bros. Lumber Co., 183 La. 1013, 165 So. 185; Stieffel v. Valentine Sugars, Inc., 188 La. 1091, 179 So. 6; Lee v. International Paper Co., La.App., 16 So.2d 679; Brown v. Furr, La.App., 19 So.2d 283; Lala v. American Sugar Refining Co., La.App., 38 So.2d 415. With those basic rules in mind the evidence in this case has been re-examined.
Plaintiff put on four witnesses besides himself; defendant put on one witness. Two of plaintiff's witnesses were physicians, and two were fellow employees who had worked on a job with plaintiff for eight months beginning three weeks after his injury. Dr. McVea, one of plaintiff's witnesses, examined plaintiff first on September 26, 1949, or about eight months after the injury, and again on January 27, 1950. At the first examination he found a ten percent loss of function of the left leg which he thought would be permanent. He also found the left leg to be a half inch smaller than the right leg, although plaintiff is left-handed and the left leg would normally be slightly larger, and found an area of loss of sensation or partial loss of sensation in the left leg. On his second examination he found the same difference in size of the legs and also found the left leg to be more unstable than the right leg; again he felt that the ten percent loss of function would be permanent. He stated he did not think the ten percent disability would prevent plaintiff from climbing, then added, "but I don't think his leg is as strong as it was before his injury * * *." And again he said, "I don't believe he can climb quite as well as he could before he was injured." He explained further that the ten percent loss of flexion was not solely responsible for the ten percent disability, but that the difference in lateral motion in the knees makes a difference to the man, as does the difference in stability in the knees also.
Dr. Sabatier, another of plaintiff's witnesses, examined plaintiff on March 29, 1949 and again on the day of the trial. At the first examination he found several superficial abscesses, a swollen knee joint, *396 an acute inguinal lymphadenitis, threefourths atrophy of the left thigh, and fifty percent limitation of motion at the knee. He found on both occasions an area of diminished sensation or loss of nerve function in the left leg, the return of which he felt was doubtful. He estimated the lower extremity to be about ten percent disabled. He stated that the muscle function should return to normal with use and expressed the opinion that Newsom could safely climb and could resume his occupation as an iron worker; then he added: "I feel that early after the resumption of such an occupation that his proficiency will undoubtedly be impaired but that his efficiency and proficiency should increase after he has been so employed for a matter of weeks or perhaps months."
George Hart testified that he worked on a job with plaintiff for about eight months after plaintiff's injury; that during this time, although plaintiff was classified as an iron worker, actually his work was that of a "swamper", or truck driver; and during that eight months Newsom didn't do any climbing although Hart says other iron workers did climb.
Dempsey Kerr, an iron worker foreman for about ten years, was the fourth witness produced by plaintiff; he was plaintiff's superior on the job that plaintiff held for eight months after the injury. He stated that he understood plaintiff had been injured and could not climb so he assigned him to work as a "swamper", in which capacity plaintiff didn't do any climbing or much standing. When asked what was required of a man to be suited to be an iron worker he stated:
"A. In a first class condition whereas he can climb, pick up anything that he could possibly pick up because he gets in a position where he can have no help. If he is on top of a guy derrick when it is being rigged up there's only room for two men and both of them have to be in perfect condition. In a riveting gang it takes four men who have to be able to climb and to hang on to the steel by their legs. Lots of times you can not get a scaffold in certain places to drive.
"Q. You say they have to hang on to the steel by their legs? A. Yes, sir, I mean by that a man would swing over and hold himself by his legs, lock his legs under the steel and hold down there to drive rivets in certain places. He is required to unload all heavy machinery and that requires lots of cribbing in which heavy timbers are used and have to be placed manually. I guess that just about covers it."
The only witness produced by defendants was Dr. J. F. Tanna, who was the physician engaged by the employer to treat plaintiff after his injury. One of his signed reports, dated 3-24-49, is in evidence which, in answer to the question "Is patient able to continue work?" gave the answer "No." Another of his reports is in evidence, dated 4-26-49, which said that the patient was able to return to work on 3-22-49. On the stand he testified that at the time he treated plaintiff it was his opinion that Newsom would make a complete recovery; that was in March, 1949, and he admittedly had not examined Newsom since the date of his second report and was not familiar with Newsom's condition at the time of the trial. His testimony was of no value to either party.
The defense to this case rests on two grounds; that plaintiff went back to work and worked for eight months under the classification of "iron worker", the same union classification he had before his injury; and that plaintiff's own medical witnesses were of the opinion that plaintiff could still safely climb and perform the functions of an iron worker.
While it is true that plaintiff did go back to work and did hold a job for eight months classified as an iron worker, yet the fact is that he did not then perform the usual duties of an iron worker but was given lighter and safer work as a "swamper"; his job was to operate a truck and move steel from a point of storage to where it was to be used or placed in position. There is a radical and big difference between the usual duties of an iron worker and the duties of a swamper. This is similar to the difference between operating a hugh tandem truck and trailer *397 and operating a light pick-up or delivery truck; although both operators are called "truck drivers" it is commonly known that not everyone who can handle the small trucks can also handle the big ones. In this case it was testified to by plaintiff and by Dempsey Kerr, and we believe the testimony is correct, that the work of a swamper is usually reserved for the older men and the cripples. The fact, then, that plaintiff went to work as a swamper and worked as long as that work was available, should not militate against him. On the other hand, it shows a commendable attitude.
When the medical testimony is examined we see that while both doctors expressed the belief that plaintiff could safely go back to climbing and performing the usual duties of an iron worker, yet one of them acknowledged that his leg was not as strong as it normally was and that he could not climb quite as well as he could before the injury, and the other felt that if he went back to climbing his proficiency would undoubtedly be impaired at first but it should increase after he had been so employed for a matter of weeks or perhaps months. If, however, plaintiff cannot go back to climbing steel structures, either because of a fear on his part that climbing would endanger his life or because of a similar fear on the part of employers, then he will never have an opportunity to "regain his function", and the opinion by the doctor that his efficiency would increase after he returned to the job becomes meaningless and of no value. The court can take cognizance of the fact that when doctors express opinions on such a subject as this their opinions are not fortified by experience such as has been had by the men who have for years climbed and straddled the steel girders.
Plaintiff had followed steel work for some twenty years before this injury. Now, because of the condition of his injured leg, he says he is afraid to attempt climbing like he has done in the past. Mr. Kerr, a steel worker foreman, expressed what he felt was the attitude of employers when he said, "I think if a man like Mr. Newsom or any other man had impairment that was known to the employer I don't believe he could go to work at all." This testimony is impressive. Some jobs are more hazardous for the employee than others; and, from the standpoint of compensation risks, some jobs are more hazardous for the employer than others. The job of iron worker is apparently extrahazardous to both the employee and employer.
The Second Circuit Court of Appeal in Brown v. Furr, supra, quoted favorably from Lee v. International Paper Co., La.App., 16 So.2d 679, 681, as follows: "Our law does not require a man to work after having been injured if working causes him pain due to that injury and to do so would abolish in part, at least, the humane theory of the Compensation Act." [19 So.2d 285.]
We might paraphrase that by saying that our law does not require a man to do what in his opinion would amount to risking his life in order to prove after an injury that he is entitled to compensation, for to do so would abolish the humane theory of the compensation act. It is not difficult to understand plaintiff's objection to returning to his usual duties as iron worker in view of the instability, stiffness, and numbness, in his leg that the doctors say does exist. There is no doubt from the evidence that plaintiff cannot now perform his usual duties without a certain amount of unusual risk to his life.
For these reasons the judgment of the district court and the judgment first rendered by this court are reversed and set aside, and judgment rendered in favor of plaintiff and against defendants, in solido, awarding him compensation at the rate of $30.00 per week for the period of total and permanent disability, not, however, beyond 400 weeks, subject to a credit of $240.00 already paid for eight weeks (or up to April 26, 1949); each weekly installment due under this judgment to bear interest at the legal rate from its due date until paid; and all costs to be paid by the defendants.
The right is reserved to defendants to apply for rehearing.