JANVIER, Judge.
On November 25th, 1948, Roy Saltzman, an employee of Lone Star Cement Corporation, sustained accidental injuries while at work in the plant of the said company. Later, having voluntarily discontinued his employment with the said company, he brought this suit for compensation alleging that, as a result of the said accident, he is permanently, totally disabled. He prayed for judgment for $30 per week for 400 weeks.
Defendant admitted the employment and the occurrence of the accident hut denied liability, averring that plaintiff, after the accident, had returned to work and had remained in its employ until February 10th, 1949, at which time he had completely recovered and, at which time, he voluntarily left defendant’s employ to' embark on a business venture; that he, “plaintiff is fully able to do the type work he did while employed by defendant, but has ceased doing same because of, a greater economic opportunity which came to him in another field; * * * ”
There was judgment in favor of defendant dismissing plaintiff’s suit, and he has appealed.
It is conceded by defendant that, at the time of the accident, plaintiff was earning approximately the amount alleged, to-wit $48 per week, and that consequently if he is totally and permanently disabled, he is entitled to the maximum weekly award of *675 $30, as provided by the Workmen’s Compensation Law of Louisiana, LSA — R.S. 23:1202.
On the other hand, it is conceded by plaintiff that, at his new employment, he is earning $50 per week, together with a share in the earnings of the business in which he is engaged.
The sole question presented is whether, within the contemplation of the workmen’s compensation law, plaintiff is totally, permanently disabled to do work of any reasonable character.
Plaintiff is 28 years of age. At the time of the accident he had been in defendant’s employ approximately two months. Pie was first employed as a general repairer’s helper and, according to his testimony, did any odd jobs that were required in the plant. Shortly after he entered defendant’s employ it was discovered that he had some experience in electric welding, and he was promoted to third class welder and in that position continued to do general repair work and also such electric welding as was required of him. His work was not particularly identified with the manufacture, packaging or selling of cement, being such work as would ordinarily be done around any manufacturing plant, and he came into contact with cement and the dust resulting from its maufacture or packaging only as an incident of his being employed in such a plant.
On the day of the accident he was engaged in assisting in repairing a dust feeder, which, we understand, collects cement dust and exhausts it from the plant. The crew was removing the feeder for repair or reconstruction when an accumulation of hot cement dust broke loose from a part of the machinery which was being removed and fell into the open top of the shoe on plaintiff’s right foot. According to his foreman, this shoe had “only one string” and “was more of a cone, more of a funnel,” and the hot cement dust severely burned the inside of his right foot just over the maleolus or ankle bone. The size of the burn is variously stated as about 2x3 inches, or as having a radius of about 1% inch.
Plaintiff says that he remained on crutches until about the middle of January, 1949 — (the accident occurred on. November 24th, 1948); that he was paid during that time; he says that until he voluntarily left the employ of defendant, on February 10th, 1949, he “didn’t do any climbing,” and the record shows that he apparently did his regular work. He says that he left defendant’s employ because “I was suffering so much I went in with my brother in the drugstore.”
At the time of the trial, on January 22nd, 1951, the district judge examined the scar which remained on plaintiff’s foot and “for the benefit of the appellate court” described it as follows: “The Court will describe it as the area around the inside bone just over the heel an area similar to a circle with a radius of one to one and a half inches to be brownish yellow. If the Court had looked at it without knowing that the man was injured the Court would think that the man did not wash his foot for about two weeks.”
Four doctors testified — two on behalf of plaintiff and two on behalf of defendant.
Dr. J. D. Landry, a physician produced by plaintiff, says that he first saw the plaintiff on or about November 15th, 1950, (about two years after the accident) ; that at that time “he had an old scar on the medial side of the right ankle about two inches in diameter. It was a thin .atrophic scar. He said that that means “that the skin was very thin, not thick.” He examined the scar in the courtroom and said that it was about in the same condition as that in which it was on his former examination, except that previously “he had several small areas where they looked ulcerated which this type of scar would continue to do off and on.” He was asked what would be his “recommendation to this man with regard to working around an area wherein there is a substantial amount of heat or excessive heat or substantial amounts of abrasives, chemical dust, * * * ” and he answered: “I wouldn’t advise this man to work in such a place,” * * * “because this type of scar has a tendency to break down very easily.” Later he gave the following testimony :
“Q. Doctor, what is your opinion with regard to these small recurring ulcerations that you-spoke of if he were to come in contact with abrasives and chemicals of the *676 type that are put in a cement plant? A, Well, I don’t know exactly what type chemicals are in a cement plant, but any abrasives will have a tendency to break this area down whereas it would not in normal skin.
“Q. And for that reason, you recommend that he should not work at his former occupation ? . A. Not at that type work if its possible for the man to make a living any other way.”
Still later he was asked what he meant when he said that such a scar would have a tendency to “break down”, and he answered: “I couldn’t swear that the man would have a break down in this area of skin. If you want to try him, put him in a cement plant. He may get along alright, but I doubt it. * * * ” And still later he was asked if he could see any “evidence of any ill effects from any abrasives on the ankle today,” and he 'answered: “No, sir.”
Dr. Charles B. Kennedy, a specialist in dermatology, as a witness produced by plaintiff, said that he had first seen the plaintiff on November 24th, 1950, (approximately two years after the accident). He described his first meeting with the plaintiff as follows: “He stated that he immediately felt a burning in that area and went to the first aid station and later went to his private physician and I understand from him that it took until around the latter part of January 1950 to become completely healed.”
He described plaintiff’s scar as follows: “On examination on the medial side of his right ankle there is an area of approximately three inches in diameter just right over the bony maleolus of his ankle. It is covered with a thin atrophic scar. The scar is dry and sligTitly scaley. There is evidence of new blood vessels formation within this scar. The scar is not adherent to the underlying tissue or bone and is freely movable. There is no evidence of a break in the continuity of the surface on that examination.” He was asked for his recommendation concerning plaintiff’s “working around areas of intense heat or areas where he may come in contact'with abrasives,” and after a colliquy between counsel, he said that it would not be advisable for plaintiff to do the same type of work because “if it was a hazardous industry where he continued getting lime or cement in his shoe dr any rough substance it would break down this scar.” He was asked: “How about heat; would heat have anything to do with it ?” And he answered: “I wouldn’t think so.” He was further asked: “Would heat causing perspiration help to advance the process of irritation?” And he answered: “I wouldn’t think so.” He was asked whether the plaintiff could do the same kind of work in the same location if “he put on a rubber sock or something that would exclude the entrance of any particles of any kind,” and he answered that “he could wear a protective bandage or dressing. If he wore it every day it would be some protection but when he would be walking around they have a tendency to roll up and form a cord and that might be a source of irritation to it. * * * ” jje was asked “if it would be of some help”, and he answered: “Yes, sir, it would be some protection.” He was asked whether it is fairly possible that this man can go back to his job and not suffer any difficulty with this scar,” and he answered: “Well, I think if I was hiring a man who had that sort of thing on his ankle, with that sort of injury, I would be hesitant in hiring him.”
He unquestionably based his opinion on the fact that, in a cement plant or in some other plant in which there were such dust or abrasives in the air, the scar might be subject to further abrasions because he stated: “I would reject him for that type of work. I would tell them that I did not feel that he was a good risk to work around hot cement, sand, gravel or things that could cause abrasions on that thing, feeling that it would be difficult to heal.” And he was asked: “Would you reject him for welding, period?” and he answered: “No, certainly not.” The court then asked him: “Could he do welding other than around cement or a cement plant, doctor ?” and he answered: “Yes, sir.” To the question: “He could do general welding anywhere?” he answered: “Yes, sir.”
Dr. J. W. Tedder, a specialist in dermatology, produced on behalf of defendant, said that he had seen plaintiff on December *677 4th, 1950, and that at that time plaintiff had given him the following history: That he had received a burn from hot cement; that “the lesion healed uneventfully and the patient returned to work in November, 1949” (Obviously he meant 1948). Dr. Tedder said that his examination revealed a well built healthy male aged twenty-eight; that he found a healed soar two by three inches on “inner aspect of right ankle. No objective findings other than thin tissue paper scar.” He said that ordinarily such a scar would normally heal in about two months. Dr. Tedder said that the plaintiff is not disabled from doing work >as a welder, and that “he could follow any occupation that did not put any undue- stress or strain on the healed scar,” and that with such a scar plaintiff “should live a normal life expectancy without complications.” On cross-examination he stated that should there be a further “lesion” in that area, the healing would be slower than normal.
Dr. M. T. Van Studdiford, admittedly a specialist in dermatology, says that when he examined plaintiff on January 19th, 1951, he saw the scar, and referring to it, the doctor says “ * * * he had a very good scar there.” He was asked: “Would you say that this scar would disable this man to carry on his trained vocation as a welder ?” and he answered: “No, I think that a welder usually protects his legs anyway on account of burning sparks and burning pieces of metal that fly off and I would say that he could carry on his occupation as a welder.” To the question: “Would you say that this man is disabled to work in an area that might contain an excessive amount of cement dust or a greater amount of cement dust than in a normal place?” the doctor answered: “Not if he protected his leg with socks. Unless he rubbed cement into his tissue or got cement into his socks and did an excessive amount of walking there would be the same irritation there as if a rock in his shoe and he walked on it.”
Dr. Van Studdiford said that there should be no pain in this scar in normal movements. He was asked whether, if plaintiff should be put to work in a cement plant, Be felt “there would be any more tendency for this scar to become irritated than his other ankle which had never been injured or to this ankle if this accident had never happened?” and he answered: “* * * I imagine that this scar tissue might be a little more tender than 'his normal tissue, but not so much that the tissues would not withhold or withstand that irritation and remain healthy. I think that he would retain a healthy scar if he did that kind of work.” Asked how long it might require for the scar to become completely healed, Dr. Van Studdiford said: “It’s healed perfectly. There is no serum in there, there is no crust or soabs peeling off there; it is healed perfectly. But, it has that redness there which will gradually disappear. As long as that is there and disappearing, it is healing.” The question was asked: “Were you in a position to recommend this man for employment, would you recommend that he work in an employment wherein he would come in contact with abrasives and cement?” and he answered: “Well, I would not recommend anyone with a scar that he abrase the scar, but if he could do his work without irritating his scar, I would recommend him for that, yes, sir.”
Dr. Van Studdiford unquestionably was of the opinion that, by the use of socks and high-top shoes plaintiff “could amply protect himself against, such irritation.”
A study of the evidence, and particularly of that given by the medical experts convinces us that there is no doubt at all that plaintiff is fully able to do all or any part of the work which he did prior to the occurrence of the accident, but that there is a possibility, perhaps a probability, that should he undertake to do the same kind of work in the same kind of plant without protecting his ankle against the possibility of abrasion, the scar might break down and he might become disabled. We also conclude that in all probability, even this danger would be removed or certainly lessened by the use of protective socks or shoes. We also conclude that in all probability his ability to obtain work in that type of plant would be somewhat lessened by the fact that he had sustained this injury. We have no doubt at all that at the present time plaintiff is employed and is receiving considerably more per week than he earned in *678 his former employment. We conclude, also, as did the district judge, that “he has given up his former occupation as an electric welder and general repairman’s helper not because he cannot work at it, even in a cement plant with proper clothing, but because he chose to engage in lighter work with his brother at more lucrative compensation.”
Under these facts, the question is presented whether he has been disabled within the contemplation of paragraph two, section 1221, LSA—R.S. 23 of the Workmen’s Compensation Statute.
There are many cases in which this particular paragraph has been most liberally construed — as no doubt it should be — in favor of injured employees. As long ago as in Knispel v. Gulf States Utilities Co., 174 La. 401, 141 So. 9, 12, the Supreme Court said: “The disability should, we think, be deemed total to do work of any reasonable character, within the intendment of the law, whenever it appears that the employee, due to the injury, is unable to perform work of the same or similar description that he is accustomed to perform.”
In Stieffel v. Valentine Sugars, Inc., 188 La. 1091, 179 So. 6, 9, the Supreme Court discussed at length the question of whether the disability must be complete in order to permit an injured employee to claim disability “to do work of any reasonable character”. There the plaintiff had been a clerk and a stenographer in the office of defendant, and “ * * * while on an errand for his employer, * * * riding in a Ford truck * * *,” he sustained injuries which obviously did not prevent (him from performing his duties as clerk and stenographer though they caused partial shortening of one leg, with the result that he was unable to stand for long periods of time. When he did so he suffered considerable pain. The Supreme Court, in holding that he was unable to do work of any reasonable character, quoted with approval from Pete v. Metropolitan Life Insurance Co., La.App., 171 So. 868, as follows : “ ‘ * * * The provision “does not mean that plaintiff must, in order to avail himself of these benefits, become absolutely helpless, but merely requires such disability as renders him unable to perform the substantial and material part of his occupation.” ’ ”
In Yarbrough v. Great American Indemnity Co., La.App., 159 So. 438, 442, the Court said: “It is not in keeping with the spirit and philosophy of the Workmen’s Compensation Law to say that an injured laborer is not totally disabled to do work of any reasonable character, under its provisions, because he may be able to do some sort of work, even though in doing so physical pain and discomfort rack his body or some of its members; and, as in this case, where it appears that by performing the sort of labor plaintiff was performing as an avocation when injured, the pain and discomfort is increasingly aggravated, it would be a traverse of the humane spirit of that law to say that he is not entitled to the maximum of compensation provided by it.”
Plaintiff cites McKenzie v. Standard Motor Car Co., La.App., 15 So.2d 115, 116, in which the employee was held to be totally and permanently disabled. There the plaintiff "had been doing body and fender automobile work for a number of years when he was injured.” After sustaining the injury he was employed by another automobile repair company as a superintendent making estimates on repair jobs. The court found that in his new capacity the plaintiff “supervises the men under him, makes estimates on and outlines the repair work to be done on a given job, makes inspections.and in emergencies lends his personal assistance. At times he picks up and delivers cars. Generally he acts as foreman and superintendent and runs the shop.” But the court also found that foe could not “do any manual labor even though in isolated instances he may have to lend a hand in his supervisory job as foreman. The essential point is, that he is totally and permanently incapacitated from doing any extended manual work or work involving bending or stooping, which was the work foe had been fitted for by training and experience.” In other words, it was held that though he could work in the same field — auto repairing — he could not do *679 the same kind of work in which he had been previously engaged.
We note the following significant remark of the court; “ * * * in other words, the basis of the distinction is the ‘character’ or type of work done by the individual .and not the field of business in which his employer is engaged.”
In the case at bar the plaintiff certainly could do the same kind of work at which he was engaged at the time of the accident. His complaint lies not in the fact that he cannot do the same kind of work but results from the possibility that he cannot do it in the same kind of plant.
Great reliance is placed by plaintiff upon the holding of the Court of Appeal for the First Circuit in Sutcliffe v. E. I. Dupont De Nemours & Co., 36 So.2d 874, 875. There the plaintiff had worked himself up until “finally becoming a foreman, the highest paid job, in the cell room of that (sodium) department.” (Parenthesis ours.) After the accident the plaintiff actually went back to work in the same department but found that he could not remain around the cells because “his skin would not stand the heat which irritated it and his clothes rubbed his burns and the salt and chlorine in the air kept him irritated.”
There are two facts which distinguish that case from this. There the plaintiff actually tried to return to the same employment and found that he was unable to continue. Furthermore, he had become what may be termed an expert in that particular department and could therefore take advantage of the knowledge which he had acquired only by working in a sodium department. Here plaintiff did not attempt to go back to work and by doing so prove that 'he could not continue in that kind of work. As a matter of fact, he left the work voluntarily for a more remunerative position. Furthermore, his particular skill as an electric welder could have been exercised in innumerable other establishments. He was not limited to work in a cement plant.
In Hecht v. Higgins Industries, Inc., La.App., 25 So.2d 351, plaintiff was employed as a ship carpenter. He sustained injuries which, according to medical experts, permanently incapacitated him from resuming his former occupation as a carpenter. It was contended that, since, prior to being a ship carpenter, he had at one time been a clerk and at another had been a street car conductor, he could still work in either of those two occupations and therefore was not disabled. We held that he could no longer do the work in which he had been engaged at the time of the accident and that consequently he had been totally disabled. Almost identical situations were found in Butzman v. Delta Shipbuilding Company, La.App., 21 So.2d 80, and in Ranatza v. Higgins Industries, Inc., 208 La. 198, 23 So.2d 45. In the latter it was held that: “A skilled carpenter, who had followed trade for more than 12 years before accident permanently disabled him from performing a carpenter’s duties, was entitled to total permanent disability benefits on ground of inability to do ‘work of any reasonable character’, though he subsequently obtained work as a bus driver.” Syllabus No. 2.
In Lala v. American Sugar Refining Co., La.App., 38 So.2d 415, plaintiff was employed as a sugar drier operating a centrifugal machine in a sugar refinery. This is highly specialized work. It was shown that after he sustained the injury, because of extreme nervousness, he could not return to his former employment. It was held that he was entitled to compensation for total disability.
In Newsom v. Caldwell & McCann, La.App., 51 So.2d 393, 396, it appeared that the plaintiff, prior to sustaining the injury, was an iron worker and that after the accident he was employed only as a “swamp-er”. The court held that he was entitled to recover for total disability, saying: “ * * * There is a radical and big dif-erence between the usual duties of an iron worker and the duties of a swamper. * * * the work of a swamper is usually reserved for the older men and the cripples.”
We are in full accord with the view that if the ability to earn a livelihood in the particular calling in which the employee was engaged when injured is destroyed *680 or substantially lessened by the accident, then it is unimportant that possibly the employee could do certain other work in some other field. But we think that that doctrine should not be extended so far as it would be necessary to extend it in order to permit the plaintiff to recover here, for the reasons given by the district judge in his written opinion:
“(1) The burn and resulting scar are not in themselves disabling to plaintiff.
“(2) The plaintiff is now, as he was before the injury, fully able to perform the same character of work, except where his scarred ankle would be unduly exposed to dust particles or similar abrasive substances.
“(3) While the scarred ankle is more susceptible to irritation from abrasive substances than the normal or unscarred parts of his body, all parts of his body are susceptible to such abrasive irritation if not properly protected.
"(4) That it is a simple matter for plaintiff to protect himself when working in a plant or other place where one of the occupational hazards is burn or irritation from dust or similar abrasive substances.”
The judgment appealed from is affirmed at the cost of appellant.
Affirmed.