The plaintiff in this case was injured while working for the Continental Oil Co., on May 18, 1942. He performed work of a common laborer and while engaged in unloading pipes on that day, a heavy iron skid pipe was knocked out of its place, struck him on his back, throwing him down and rolling over his left leg. He sustained severe fractures of that leg, two in the tibia, in both instances union having had to be made by means of metal plates screwed into the bone, and one in the fibula.
There is no dispute about his employment and about the accident, nor is it seriously contended that he had a very serious injury to his left leg. There is some question about the injury to his back which he still complains of and there is also a controversy as to the number of days he worked per week.
He was immediately placed on compensation and received payments until Nov. 2, 1942, when he returned to do lighter duties at which he remained until March 3, 1943. This last employment was then terminated and apparently plaintiff made no attempt at that time to recover further compensation. Instead he went to California and took up the trade of a welder in a ship yard there. After his training he did actual work as a welder for sometime and then returned to Westlake, near Lake Charles, and filed this suit against his employer and its compensation insurance carrier, Hartford Accident and Indemnity Co. He makes the usual allegations that by reason of the injury to his leg, which has never completely healed, he is disabled from performing duties of a laborer and is therefore entitled to compensation as for total, permanent disability for a period not to exceed 400., weeks. He alleges that he worked six days a week and is entitled to 65% of his average *Page 759 
weekly wage based on his rate of $5.04 per day, which at six days per week gives him earnings of $30.24 per week; 65% of that being $19.66, that is the amount he claims per week. He acknowledges credit for the amount of compensation paid him at the rate of $16.38 per week for the period from May 18, 1942, to November 2, 1942.
The defense to the suit is that the plaintiff has entirely recovered from the injury he sustained and that he has been paid all compensation that is due him. The trial judge after hearing the case wrote an opinion in which he reached the conclusion that plaintiff had failed to make out his case with that legal certainty which was required of him and he accordingly rejected his demand and dismissed his suit. From the judgment rendered plaintiff took this appeal.
After carefully reading and considering the testimony, which consists mostly of that of the medical experts, we are inclined to disagree with the trial judge as we believe that this man is still suffering pain from an injury to his leg which for the greater part has healed, but in a certain area, even according to the testimony of doctors for the defendants, is not entirely well and can give him trouble. Besides, because he still has two steel plates screwed to the bone in his leg, there may be some nerve and tissue involvement which may well cause him the pain he complains of.
We are convinced that if plaintiff suffered any injury to his back in the accident he has recovered from that. The preponderance of the testimony on that point is to the effect that any defect which may exist in any of the vertebrae of his back is of congenital origin and not due to the injury.
Plaintiff in testifying about the accident and how it happened, relates pretty much the same story as is set out in the petition, and on this, as we have said, he is not contradicted. In talking about the effects of his injury as they now exist, he states that any standing too long, any jar, riding on a rough bus, or any kind of awkward step causes pain and produces swelling of his leg. The day he testified was May 31, 1944, and he says that "even yesterday it was swollen up." He compares his pain to a tooth-ache and says that he feels it also with a change of weather.
Dr. S.F. Fraser who testified as a witness on his behalf stated that he examined him on April 8, 1943, and took x-rays of his leg. He found evidence of disturbances of the left leg from the knee to the ankle. There was some disturbance in the back but he says this was superficial. The disturbance in the leg was in the contour, both medial and posterial. The skin was shiny and slightly atrophic. There was tenderness along the tibia and limitation of motion in the knee and ankle. The x-ray showed the fractures and also the metal plates which had been used in the tibia together with the screws by which they were fastened.
He says that there seemed to be a good callus formation of the fibula and also over the major portion of the tibia with lack of callus in the lower fracture of that bone. He re-examined him on April 27, 1944 and was well pleased with the appearance compared to his pervious examination. However there was an area in the center part of the tibia which did not show good callus and his conclusion was that it had not completely healed. There was some scar tissue formed because of trauma as a result of broken fragments of the bone. He was prone to believe that plaintiff has quite a bit of discomfort at times and especially does he have pain after walking or using his leg for a long period of time.
In his opinion it is not advisable for the man to return to hard work and as an examining physician for industrial employment he would not pass him for that kind of work. He says he might be able to go ahead and be able to tolerate the discomfort but that would impair his efficiency.
We are rather impressed with this doctor's statement concerning the effect these steel plates in this man's leg may produce. He says that it is a well known medical fact that once you had a bad injury, one which impairs circulation of the lower extremities, or of the tissues overlying the bones, you are more liable to get an injury to a deeper tissue and more apt to get slow healing of the injury.
Dr. H.B. White also testified as a witness on behalf of the plaintiff. He examined him the day before the trial of the case and found the leg slightly swollen with a complaint of pain. This tends to corroborate the plaintiff who testified that even the day before the trial of the case, his leg was swollen. In interpretating the x-rays of April, 1943, Dr. White says that they showed apparent perfect union in the lower segment but that the upper fracture *Page 760 
was not completely healed. The x-ray plates of April, 1944, showed the lower segment in perfect condition and the upper to have formed more callus. When asked what objective symptoms he found, he referred to the pain plaintiff complained of and some swelling in the soft parts. He says that he could wear these plates indefinitely and that might not hurt him unless there was some accident to the scar tissues, but there is a possibility of constriction of the nerves. He doubts seriously that the man can pass an examination before a board for hard physical labor.
Dr. Walter Moss was the first doctor called on behalf of the defendants and while from his interpretation of the x-ray plates he found that there was complete healing of the fracture with good callus formation, and expressed the opinion that this man could do hard manual labor, still he says it was hard to deny that he has the pain he complains of. The following statement he makes is rather significant in our opinion: "You think that one should have some pain in proximity to any fracture for quite a long while after bone is repaired, whereas most of the pain comes from soft tissue injury which may have been injured at the time plus the effect of the open reduction and operation at the time. But I cannot question that thosescrews and plates are causing him pain." (Italics ours.)
Dr. W.P. Bordelon who also testified as a witness for the defendants was shown plates made by Dr. Fraser in April, 1943, some six or seven months after his examination of the plaintiff, and when asked if complete healing of the upper part of the fibula was indicated he says: "Yes, I think it does. Probably some little places in the center have not healed and a little out of line, * * * there probably may be some little places in one place up where that definitely does not show density that some other area shows." In spite of this he thinks that the injury has sufficiently healed so that the man could perform his work.
Dr. R.G. Holcombe is of the opinion that there has been good healing and that plaintiff can do hard work. He nevertheless will not give an opinion on the question of pain and admits that "he may have pain in his leg."
Dr. C.G. McKinney, the expert radiologist produced by the defendants also read Dr. Fraser's plates and found that union was good. In his opinion plaintiff can go back to hard work. On cross-examination he states that nature has to repair all fractures and seems to admit that there is a little area next to one of the steel plates where there is still a little repair for nature to do. On re-direct examination, in speaking of a shadow which appears there, he says that that means that bone production had not reached its height at the time that the x-ray plate was made.
Dr. Ben Goldsmith, the last of the doctors called by the defendants, testified that he found no evidence of injury. He saw plaintiff in May, 1943, and at the time he was not able to go to work. The x-ray showed two plates and at the point where one goes across the fracture, callus has taken place, but it is limited in amount because it does have a grayish color and there is no dense bone on the outer portion. He thinks that there could be some nerve filament throughout the structure of that bone because, as we understand him, of the screws and plates in the bone. He says that plaintiff could have some pain but in the absence of irritation around the scars he doubts that very much reaction has taken place.
[1] Thus two doctors testifying for plaintiff seem to be firmly of the opinion that plaintiff should not go back to hard work with the leg in the condition that it is and five doctors, witnesses for the defendants, although stating their opinion that he could, are fair enough to say that there is still some healing that could take place and that this man may not be misstating the truth when he says that he suffers pain in his leg at certain times. Under the rule in these cases in which we have to give the plaintiff the benefit of any doubt, we would say, contrary to what the district judge held, that this man has shown by sufficient testimony that he is disabled from doing and performing the duties of a hard working manual laborer within the meaning and intendment of the compensation statute.
The district judge was persuaded to some extent no doubt, by the argument of counsel for defendants that this man has been doing work of a welder in a ship yard in California and that shows that he is able to do hard work. In testifying about the work he did throughout his life plaintiff says the first job he ever had was in a steel gang of a railroad company driving spikes and things like that. After that he *Page 761 
worked on pipe lines which is all heavy work and he is not prepared for any other kind. He went to California because his wife was there. He went to the ship yard and explained his condition, after which he was put to work at a job where he would not have to do any lifting at all. When he told them that his leg hurt him he was sent to a hospital. After he finished his apprenticeship he was put to work and in comparing what he actually did with the hard work he performed before, states that there was no lifting to be done and no straining at all. "I used only a stinger, the outfit what you use to put the rod in to contact the metal." These vary in weight and none are very heavy, the one he used weighing about one pound. He was able to do the work because it did not require much standing on his leg. He frankly admits that he came back to Louisiana to file and prosecute this suit for compensation and he has been notified that his job in California has now terminated.
[2] It is admitted that he earned better wages in California than he did with the defendant oil company and it is urged that he could go back to that job as indeed he intends to do. Conceding that that is so and that he does go back, under rulings made by this Court in certain cases this should not deprive him of his right to recover compensation from the employer he was working for at the time of his injury. It is not the same kind of work he was doing and he will have a new and different employer. Two of the cases we refer to are McKenzie v. Standard Motor Co., La. App., 15 So.2d 115 and Thompson v. Leach McLain, La. App., 11 So.2d 109.
Much is said in brief of counsel for the defendants that this man is exaggerating his condition, that he has had fair treatment from his employer, the defendant oil company, when they tried to give him light duties to perform and he so "ratted" on the job that they found it necessary to discharge him. This however is in some measure contradicted by the testimony of his foreman, J.C. Lunn, who, as a witness, seemed rather favorable to the plaintiff. He says that they did not fire him. He does state that plaintiff complained about these minor jobs he was given and did not seem to care about them and on finding him off the job warming himself in a room one day, he asked him what he was doing and when the plaintiff told him he was sick, he told him that he might as well go home and he did not show up any more. Nevertheless he says that they carried him on the time sheet for some time after that. He sums up his estimate of the man by saying that "he was an especially handy man doing construction." He had been working for them since they started the refinery. He had worked for Dunham 
Price before and it was through their recommendation that the superintendent put him to work as lead-off man. He concludes by saying "he has always been a good man." Far from this being any testimony to bear out any charge that this plaintiff is a malingerer we would say that on the contrary his foreman convinces us of honesty in his statement that he is suffering some disability. This with the medical testimony in the case, such as we have tried to analyze it, leads us to the conclusion that he is entitled to recover compensation.
[3, 4] The evidence is not sufficient, in our opinion, to show that it was contemplated that he was employed on a longer work week basis than five days a week and his rate of compensation should be computed on wages for that amount of work per week. This entitles him to $16.38 per week, the rate at which he was paid compensation from May 18, 1942, to November 2, 1942, and for which defendants are to be given credit. In addition, it is shown that from November 2, 1942, to March 3, 1943, plaintiff was placed on light duty, performing minor and negligible services, for which he was paid his regular wage. To the extent that these wages covered the amount of compensation that was due him, defendants are entitled to credit also for that period of time. Carlino v. U.S. Fidelity Guaranty Co., 196 La. 400, 199 So. 228.
For the reasons herein stated it is ordered that the judgment appealed from be and the same is hereby reversed, set aside and annulled, and it is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against both defendants, in solido, condemning them to pay unto the plaintiff compensation at the rate of $16.38 per week for a period not exceeding 400 weeks, less amounts, at the same rate, for the period from May 18, 1942, to November 2, 1942, and also for the period from November 2, 1942, to March 3, 1943, with legal interest.
It is further ordered that the defendants, appellees, pay all costs of these proceedings. *Page 769