CAVANAUGH, Judge.
This suit is by the plaintiff for the maximum amount of $30 per week compensation, for permanent total disability under LSA-R.S. 23:1221, subparagraph 2, for a period-' not exceeding 400 weeks during the period, of his disability, when he suffered a dislo-- *695 ■cation of the ulna at the wrist joint while in the employ o'f defendant. The only disputed issue in this case is whether the plaintiff ■suffers total disability to do work of a reasonable character.
We find the facts to be. substantially as follows, as reflected by the record:
On April 21, 1952, plaintiff was employed as an iron worker by defendant at an average weekly wage of approximately $100 per week, and while performing services arising out of, incidental to and during the course of the business and trade of defendant, which he alleges is a hazardous business, under the Workmen’s Compensation Law of Louisiana, and while engaged in welding some large metal plates during the course of his employment, one of the plates fell on his left forearm causing a dislocation of the ulna at the wrist joint. The plaintiff was taken to a hospital in the City ■of Baton Rouge where, under a. general anesthesia, the dislocation was reduced by Dr. Moss Bannerman and a long-arm cast applied. The plaintiff remained in the hospital only a few hours, leaving the hospital on the same day the accident happened, and returned to work within 48 hours in the ■same crew, but, on account of the injury, he was assigned to light work called “flagging” or “swamping”. We understand that flagging or swamping is one of the light duties of an iron worker.
He pursued this light work for the defendant until May 14, 1952, at his same daily wage and left its employment of his own accord. He worked for other construction companies doing light work of a similar character until some time during the month of August or the first of September, when he left Baton Rouge to go to Charleston, West Virginia, to take a job in what he calls a “raising gang”. We understand from the evidence that an iron worker’s duties are to construct and put together steel going into the framework of buildings, structures and bridges. The duties performed by a worker in the raising gang consist of raising and putting together with bolts the sheets of iron, and that work is followed by the riveting crew that removes the bolts and rivets the pieces of iron together. This crew consists of four men, one of whom uses a riveting gun. Another one of the crew bucks the rivet and sets a bumper jack against it, while the hammer is being applied. Another one of the crew operates the heater where the rivets are heated, and his duties also require him to throw these hot rivets to another employee who catches them in a cone-shaped tin receptacle where they are placed by him in a hole for the driver to commence his work. Other workers in a construction crew remain on the ground and fasten hooks and cables to sheets of steel or other material which is lifted by means of a derrick or crane. The workers who go above the ground, whether they be in the raising gang or in the riveting gang all have to climb ladders or. columns or hang on the iron where they work or on platforms constructed so they can use the tools of their trade.
During the entire period from the time plaintiff was injured until the trial of this case, he had lost no appreciable time from work and had earned the same wages he was earning or more than at the time of the accident.
Plaintiff was attended by Dr. Bannerman from the date of the accident until he was discharged on or about .May 29, 1952, at which time Dr. Bannerman says he was able to resume his work. At that time the doctor found that he had a slight impairment of function of his left forearm due to the injuries, but he stated that the claimant had excellent strength and suffered only about twenty degrees of restricted motion in each direction and that it was his opinion that he was ready to return to his regular employment without disability at that time.
On July 29, 1952, he was examined by Dr. J. Willard Dowell at the request of his attorney, and he found that the plaintiff suffered a slight limitation of rotation in the left forearm. He determined that this was a ten degree limitation of supination. No other disabling condition was found, and it was this physician’s opinion at that time that the only possible permanent disability *696 the employee would have would he a slight limitation of rotation in the forearm, and he suggested deferring final evaluation for a period of three months.
Defendant took plaintiff’s evidence pursuant to an agreement with plaintiff’s counsel on December 23, 1952, which was within one week after plaintiff returned from West Virginia.
Dr. Bannerman last saw the plaintiff on July 11, 1952, and did not see or examine him again until March 23, 1953, which was the day before the trial. Dr. Dowell examined the plaintiff during the month of July, 1952 and examined him the last time during the latter part of December or the 'first of January, 1953. Dr. Dowell’s testimony is that the plaintiff has a 10% impairment in the function or use of the arm, whereas Dr. Bannerman estimated the disability at 5%. Both of these physicians testify that the plaintiff has a 20%. limitation of supination of the forearm.
The District Court, after hearing the evidence in the case, filed written reasons for its judgment in which he 'fully covers the facts in the case, reviewing plaintiff’s activity from the time of the accident, the nature and character of the work he performed, and makes this statement in his opinion which appears to us to be inconsistent with his reasons for judgment:
“Upon hearing and later reading plaintiff’s own testimony, I am left with the strong suspicion that there is very little if anything wrong with him.”
The Court based its award in favor of the plaintiff for total disability on the medical evidence of the two doctors who said plaintiff suffered a limitation in supination and pronation causing permanent disability of the forearm of between 5% and 10%r-^ Dr. Dowell fixing the disability at between 5%. and 10% and Dr. Bannerman at 5%. The Court stated that on account of the duties of an iron worker in the construction trade, it would be dangerous to himself and others should the worker undertake all the hazards of such work, while suffering a minor physical disability, and that in appraising all of the testimony and persuaded by oúr decision in the case of Newsom v. Caldwell & McCann, 51 So.2d 393, he concluded that the plaintiff was entitled to judgment for permanent and total disability. If our ruling in the Newsom case was correct and the plaintiff was disabled to do work of a reasonable character under the facts in that case and the evidence adduced on the trial thereof, and the facts and the evidence in this case are substantially the same, it would warrant a similar ruling.
The defendant has brought to our attention in this case a factual situation which it claims we did not have in the Newsom case. In the Newsom case, the plaintiff had suffered a crushing injury to his knee, was hospitalized for ten days and was confined to his b'ed at home for five weeks. He worked for another employer about eight months as a swamper or operator of a winch, which, according to the evidence in this case and in our opinion in the Newsom case, was light, work. Newsom, after this eight months of light work, never resumed work and was unemployed at the time of that trial. The medical evidence in the NewSom case was positive that Newsom had weakness of the muscles of his injured leg, atrophy of the muscles resulting from the injury and that there was a numbness due to a nerve injury and he was adjudged totally disabled because he could not do the work in a riveting gang and the climbing necessary for that job. If there are no distinguishable features in the Newsom case from this case, then we ought to be guided by our holding in that case, but if there are distinguishable features in it, which show that the plaintiff is not totally disabled to do' work of a reasonable character as contemplated by the total disability provisions of the statute,- and does not have disability to such an extent that it affects his working or earning capacity, and did not affect it at the time of the trial of this case, then we should not be guided absolutely by that holding.
We are not unmindful that on questions of fact and the credibility of the witnesses, the trial judge’s findings are given *697 great weight and are not to be reversed here, except where there is manifest error. However, where the Court states that it “does not find very much wrong with, the plaintiff, and it is inconceivable that he would quit a job where he was doing light work and go several hundred miles to engage in work where his greatest strength and endurance is called upon, and that he was persuaded in his conclusion by our ruling in the Newsom case”, presents an unusual reason for a judgment.
The difficult point with which we are confronted here is whether or not the plaintiff is “totally disabled to .do and perform work of a reasonable character”. Under the rulings of the appellate courts of this State that clause has been held to mean, according to liberal judicial interpretation, work of the same or similar nature for which the workman is fitted by education and previous experience; or “ ‘disability to do work of any reasonable character’, as contained in the compensation statute, means disability to perform work of the same or similar description, kind or character (not necessarily the identical position) to that which the claimant was accustomed to perform or was undertaking when the injury occurred.” Morgan v. American Bitumuls Company, 217 La. 968, 47 So.2d 739, 741; Scott v. Hillyer Deutsch Edwards, Inc., 217 La. 596, 46 So. 2d 914; Falgoust v. Maryland Casualty Company, La.App., 22 So.2d 312. It doe's not necessarily mean that an injured employee has to be able to do and perform all of the identical duties he is called upon'to do during the course of his employment. If he can do substantially all of them, he is not totally disabled within the provisions of the statute, and the total disability provisions are not to apply. Distinction has been made occasionally in applying that section of the statute when the -employee is a common laborer and when he is a skilled laborer. This distinction has grown out of the jurisprudence and not because of any statutory provision. -Whether the employee is a common laborer or whether he is a skilled employee, the true test is whether or not the injury suffered by him pre-vents him from doing work of a reasonable character.
It is not a fair test to say that a skilled employee cannot do work of a reasonable character because he cannot do every identical thing he was capable of doing prior to the accident any more than it is to say that a common laborer can do the same thing he was doing at the time of the accident. The test to be applied on the question of whether or not the total disability is to be applied is whether the- injured workman can do and perform the same or similar work to that he was performing at the time of the accident. We believe that the best criterion to follow in determining this question is whether or not, subsequent to the accident and injury, the workman did perform, and do the same type and character of work, as that which he did at the time of the injury. If the workman only suffers a partial impairment of an arm or a leg, and it does not produce disability to do work of a reasonable character, then the-specific injury provisions of the statute should be applied based on 'the percentage of the disability, but if the accident produces partial disability to do work of a reasonable ■ character, then that section of the statute should be applied.
Now the plaintiff’s main contention in this case is that he is afraid to climb on steel structures because of the impaired condition of his arm in that he says that it is weak, and that he does not have the grip he had prior to the accident, and that in an iron worker’s duties, he is required to climb all kinds of structures and hold his tools in his hand and that he cannot do the work of a riveter because he cannot use the riveting gun.
We have closely read the medical evidence to see if this statement finds support in what plaintiff says and also to determine whether the work he did in West Virginia between September, 19’52, and January of this year, and that which he was doing at the time of the trial of this case would support that statement when opposed to the medical evidence. An examination of his -,.testimony, shows that he did do and perform *698 substantial work as an iron worker for a period of four or five months in West Virginia. It is true, he did not do any work in the raising gang there, but went there to work in the raising gang, although he did actually work in a riveting gang. Upon his return to Baton Rouge he heated and pitched rivets, and if there was any impairment in his arm to prevent him from doing the work accustomed to his trade or calling, it did not prevent him from doing it because he actually did- it, and has lost no time from any job on which he has worked on account of the slight impairment in his arm.
We have examined the cases on the question of when a skilled worker cannot do all of the duties involved in. his trade, but where he can substantially do all of them, and where he continues to follow his trade subsequent to ail accident, doing the same or similar work and was denied compensation for total disability. If a skilled worker in one trade is not entitled to total disability, when he can do and perform substantially the work he was doing when he was injured, and a skilled worker in another type of trade can do the same thing, then should the court draw a distinction and apply one rule in one case and a different one in another, when it all depends on whether or not the workman suffers total disability to do work of ‘ a reasonable character ? If we apply the specific disability injury provisions and the partial disability provisions to the injury suffered by a carpenter or a mechanic when he has suffered an impairment to his leg, hand or arm, which would prevent him from doing work he was doing at the time of the accident, but does not prevent him from doing substantial work which is a part of his trade, and he continues to receive the same wages and his working or earning capacity is not diminished, then should we make a distinction where the employee happens to be an iron-worker? We think not.
The case of Falgoust v. Maryland Casualty Company, supra, in which Judge Mc-Caleb was the author of the opinion, was a case involving an injury to the left elbow of a carpenter, causing the loss of function !-of his arm and impaired his ability to climb ladde.rs and hold on on roofs, and the doctors in that case said he had an impairment in his arm of 25%. to 50%. The plaintiff there made the same contention .as the-plaintiff here: That by reason of a weakened arm and his fear of being unable to get in high places and on roofs, he could not follow his usual vocation. In that case, as in this case, the plaintiff resumed his-work- a short time after the accident and did substantially his duties as a carpenter and earned the same wages he earned prior to-the accident, but for a different employer. The test there was- that the employee resumed his trade and did and performed the-same duties in that trade, although not the identical things, and he was denied compensation for total disability. See also Willet v. American Automobile Ins. Co., La.. App., 42 So.2d 570.
The. question of whether or not an em- ’ ployee can do substantially similar work or work of a similar character or perform substantially the work he was performing at the time of the alleged accident has to be answered largely on the medical evidence in the case. The Court below held that the medical evidence in this case showed that the plaintiff was supported by the medical evidence in that Dr. Dowell testified that the plaintiff had a 5% to 10%, disability in the arm and that Dr. Bannerman testified that plaintiff had a 5% disability in the arm. Now let us refer to that testimony, and see if that small percentage of disability affected the plaintiff’s ability to do the work he was trained to do and accustomed to do in his customary way and whether or not in the doctors’ opinions the plaintiff was unable to do and perform the duties of an iron worker.
The testimony of Dr. Dowell is as follows :
“Q. By the Court: What effect does that have on the muscular strength of the arm? A. Well, I think where you have got an increased motion you don’t have as stable a wrist as you would have in regard to strength itself.
*699 “Q. What do yoü meán by stable? A. Well — '
“Q. Lack of muscular strength or what? I don’t understand what you mean by stable. Is it going to jump out of joint or something? A. The ligaments are put there primarily to hold the ulna to the radius. If you •didn’t have them there your joint would jump out of place, yes, sir. If you have. — by .stable I mean where, it is held in position that it was intended to be held. If you have a relaxation ■there you .may have some slipping when you carry out certain movements.”
Then on cross examination this physician, was asked by defendant’s counsel:
"Q. Did this man ever give you any history, Doctor, of any slipping of his wrist joint or any part of his forearm when carrying out any movements at all? A. No, sir, he didn’t describe any slipping.”
Dr. Bannerman, the doctor who attended plaintiff at the time he was injured until he was discharged on May 29, 1952, and who saw him several times during that period and who examined him just before the trial commenced, testified as follows:
“Q. Now, Doctor, when I called you to ask that you make this examination, were you told that this case was in litigation? A. Yes, sir.
“Q. Were you told that it was to be . tried today presumably? A. Yes, sir.
“Q. Were you told that this man was an ironworker? A. Yes, sir.
“Q. Did you know that before ? A. Yes, sir.
“Q. Were you told that one of the contentions was whether or not this man was able to do the work of an ironworker? A. 'Yes, sir.
“Q. Were you told that an examination was requested by you in order to determine your opinion on that issue? A. Yes, sir.
“Q. Did you make such an examination? A. I did.
“Q. What is your opinion on that issue? A. It is reflected in my report that this man is able to do any type of work which he desires tó do..
. “Q. Does that include any and all the work of an ironworker as you know it to be? A. Yes, sir.”
At the conclusion of the direct examination the Court asked Dr. Bannerman these questions:
By the Court:
“Q. I would like to ask the Doctor one or two questions. Does this limitation in rotation, is that what it is? A. Yes, sir, motion.
“Q. Does that in your opinion, lessen the strength of that arm, the mus- ' cular strength, the grip and hold? A. The grip and hold, no. At the extremes of motion where he cannot quite go now he has a little more difficulty because he doesn’t swing around this far, but the strength in gripping in certain positions is intact.”
The Court evidently assumed from this evidence and from plaintiff’s evidence and his witnesses that the plaintiff was totally disabled. We cannot give the weight to the medical evidence in this case given by the Court below because it does not show that this limitation in the’rotation of plaintiff’s arm is such an impairment when considered with all of the other evidence in the case to conclusively show that he is unable to do and perform the substantial duties of his trade. The plaintiff has not suffered or experienced any slipping out of the joint as mentioned by Dr. Dowell, and Dr. Dowell did not testify that the plaintiff could not do and perform the substantial duties of an iron worker, while Dr. Bannerman did testify that this plaintiff could do all of the duties of an iron worker in spite of this impairment of rotation.
*700 The plaintiff in this case, after the injury, knew better than any one else his capabilities and his limitations to do and perform the work óf his trade, and the matter here decided is the work performed by him after the accident and injury is sufficient to show that he has substantially performed the services of an iron worker by. actual work in the trade, and he can hold a job in that capacity by doing the work under conditions existing in the trade at the time the case was tried. ■
The evidence as a whole convinces us that plaintiff has actually worked at his trade' continuously without light work 'as-' signments since September, 1952, and with-' out request by him for any light job consistent with the work he did. At the time the case was tried, he was actively engaged in performing the duties of his trade, without light work assignments. We find that heating, throwing, catching and bucking rivets in a riveting gang in the trade of an iron worker is hard, laborious work. The work performed by an iron worker in a riveting gang and that performed by plaintiff. in a raising gang .are similar in character.
So long as he is able to perform actual work in a riveting gang and earn as much or more, after suffering at most a 10% impairment in his left forearm, he is not permanently and totally disabled to do work of a reasonable character under the provisions of subparagraph 2, Section 1221, Title 23, LSA-R.S.
We have examined Knispel v. Gulf States Utilities Co., Inc., 174 La. 401, 141 So. 9; Thibodeaux v. W. Horace Williams Co., La.App., 14 So.2d 320; Fisher v. Standard Accident Insurance Co., La.App., 28 So.2d 59; Brown v. Continental Oil Co., La.App., 22 So.2d 758; DeKerlegand v. Car & General Ins. Corp., Ltd., La.App., 30 So.2d 881; McKinzie v. Standard Motor Car Co., La.App., 15 So.2d 115; Strother v. Standard Accident Ins. Co., 63 So.2d 484; Scott v. Fulton Bag & Cotton Mills, La.App., 65 So.2d 397; and Rabitaille v. Steel Tank Construction Company, La.App., 42 So.2d 300, cited in the brief of ap-pellee 'and find that they cannot support the judgment of the Trial Court in this case, because the injury in each one was more extensive, or the work performed following the injury was dissimilar in character under the facts, or the evidence conclusively established the total and permanent disability of the employee. We reaffirm our statement in the Newsom case that each case must stand or fall on its merits.
The economic conditions prevailing in the Baton Rouge area subsequent to the time of the accident and the time of the trial of- this case reflecting a recession of working conditions in the plaintiff’s trade has nothing to do with his right to recover compensation benefits, or his employer’s liability for those benefits under the compensation statute. Judicial decisions must be found on fact and the law applicable thereto, and not on conjecture; and neither boom times nor a depression should be considered in a case of this kind. Falgoust v. Maryland Casualty Company, supra, 22 So. 2d 312; Bailey v. Maryland Casualty Company, 34 So.2d 354.
Under the evidence in this case, the plaintiff was totally disabled from the' date of the accident, on April 21, 1952, until about September 1st, when he went to work in West Virginia for the American Bridge Company, and subsequent to that time he suffered no permanent total disability but only suffered a permanent partial disability of 10% of the use of function of the left forearm; and that after that date he was capable to pursue the duties of his trade of an ironworker. Therefore, he is entitled to compensation based on that disability.
The method by which his compensation is computed for specific disability amounting to the partial loss of function of a member is to take the proportion of the partial loss from 65% of the weekly wage and, allow such amount as compensation for the number of weeks permitted for the total loss of the member. Morgan v. Standard Accident Insurance Company, La.App., 51 So.2d 107, and cases, therein cited. This is a rule- we followed in the cited case, and it will be followed here. The plaintiff was earning *701 $100 per week; therefore, 10% of 65%, of his average wage would amount to $6.50. He was totally disabled from the date of the accident to September 1, 1952, or a period of 19 weeks, for which period the maximum compensation of $30 per week will be allowed, and for the remaining 181 weeks he is entitled to $6.50, less a credit of 3 weeks and 1' day following the accident, during which period he remained in the employ of defendant and collected wages.
For the reasons hereinabove assigned, it is ordered that the judgment below is amended by decreeing that the plaintiff is awarded compensation for total permanent disability for a period of 19 weeks at $30 per week from April 14, 1952 to September 1, 1952, and for 181 weeks, or from September 1, 1952, at the rate of $6.50 per week, less a credit of 3 weeks and 1 day, for which period he collected wages, plus legal interest on delinquent installments, and that the judgment thus amended be affirmed at the cost of defendant.
It is ordered that said judgment, as amended, be affirmed.