75 So.2d 361 (1954)
Eugene A. WATSON
v.
FLOYD ELECTRIC COMPANY, Inc. et al.
No. 3869.
Court of Appeal of Louisiana, First Circuit.
October 6, 1954.
Rehearing Denied November 18, 1954.
Writ of Certiorari Denied January 10, 1955.
*362 Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellants.
Burton & Roberts, Baton Rouge, for appellee.
CAVANAUGH, Judge.
Plaintiff, on February 16, 1953, while performing services arising out of, incidental to and during the course, business and trade of defendant, suffered a compression fracture of the twelfth lumbar vertebra when he was kneeling down and a creosoted line pole rolled off a trailer truck and fell upon him. He was immediately taken to a Baton Rough Hospital and placed under the care of Dr. Moss M. Bannerman, an orthopedic specialist. Plaintiff was placed on a bed so that his back was reversed in its normal position, and he was bent backward at the side of the fracture, with his shoulders and hips going back and pressure applied on the fractured side. About a week after the injury, plaintiff was given surgery and his back was forcibly reduced and a cast applied. An X-ray was made after the reduction, which showed excellent re-expansion of the previously compressed body. He remained in this case for about two months and a half, and after which time a brace was applied and which the plaintiff wore for about three months and during which time the plaintiff received exercises to strengthen his lower back. X-rays were made of plaintiff's spine after he had been in the brace for some time and they reflected healing with some loss of the previously gained expansion. The brace was removed and the exercises continued, and by the middle of July, 1953 it was thought plaintiff could return to light work. At that time plaintiff had full range of motion of his back and experienced no pain while wearing the brace. He was seen by the attending physician intermittently for an additional period of two months, or until September 24, 1953, at which time the attending physician thought that he was able to resume his employment as an electrician's helper, and he so notified the defendant and its insurance carrier, the Maryland Casualty Company. Plaintiff's compensation was discontinued on that date. He did not return to his former work, and has not performed any work since the accident.
On October 5, 1953, or about ten days after he was discharged by the attending physician as able to resume his work, he filed this suit without being examined by another physician.
He claims compensation for total disability, based upon the fact that he is not able to perform all of the work required of him as a "grunt", the term used in the trade to refer to an electrician's helper, together with legal interest on past due instalments of $30. per week, as well as 12% penalty `and attorney's fees of $1,000, against the compensation insurer, Maryland Casualty Company.
The defense to the suit is that plaintiff had fully recovered from the accidental injuries suffered by him on February 16, 1953; that at the time plaintiff's compensation payments were discontinued, plaintiff was able to do and perform the same kind and character of work he was performing at the time of the alleged accident; that defendants had paid plaintiff all compensation due to him and had paid $737.50 medical and hospital bills, and at the time plaintiff's compensation *363 payments were discontinued, defendants were apprised by the attending physician that plaintiff had fully recovered and was able to do and perform his work.
After trial in the District Court, judgment was rendered in favor of plaintiff for total disability for compensation at the rate of $30. per week for a period not exceeding 400 weeks during plaintiff's disability, with legal interest on past due instalments, less 31 weeks' compensation paid up to September 21, 1953. Plaintiff's demand for penalties and attorney's fees was rejected.
From the judgment, the defendants have appealed and plaintiff has answered the appeal asking that we amend the judgment by granting plaintiff judgment against the insurance carrier, Maryland Casualty Company, for an additional sum of 12% of principal and interest as penalties, provided in Section 658 of LSA Title 22 of the Revised Statutes of 1950, plus a reasonable attorney's fee of $1,000 and that the judgment, as amended, be affirmed.
The disputed questions in this case are: (1) Whether or not the plaintiff is totally disabled or is he only partially disabled to do the same kind and character of work he was performing at the time of the alleged accident; (2) whether or not the defendant insurance company is liable for the statutory penalty and attorney's fees for discontinuing plaintiff's compensation.
In order to determine whether or not plaintiff is totally disabled or only partially disabled, we have to consider the type of work he was doing at the time of the alleged accident and the nature and extent of his injury. To prove his disability, plaintiff called Drs. William M. Moody, J. Willard Dowell and Frank J. Rieger. Drs. William M. Moody and Frank J. Rieger are ordinary practitioners. Dr. J. Willard Dowell is an orthopedic specialist. The only medical testimony offered by the defendant was that of Dr. Moss M. Bannerman, who attended plaintiff after he suffered the accidental injury. This doctor is a qualified orthopedic surgeon who has had 16 years' active practice. He and Dr. Dowell are two of the recognized orthopedists in Louisiana, and the cases in which they have testified are numerous. Both of these physicians agree that plaintiff has between 10% and 15% total disability of his entire body to do and perform the work he was performing at the time of the alleged accident. The other physicians think that he probably has 15% to 20% disability.
Dr. Dowell testified that he examined the plaintiff on December 10, 1953 at the request of Mr. L. W. Brooks, who is attorney for the defendants; that all of the X-rays made of the plaintiff were available at his examination; and that at the time of his examination plaintiff was complaining of pain in his lower back at the side of the fracture and that plaintiff described the pain as not radiating to either leg and not being aggravated by coughing or sneezing. The plaintiff stated to him that he was unable to lift due to the pain in his back and stated that bending of his spine is painful. A part of his report reads as follows:
"On examination it was noted that the patient was a tall, thin individual. He gives his height as 6 ft. 1 inch, and states that he weights 140 lbs. Examination shows slight prominence of the 12th dorsal vertebra. The patient complains of pain when pressure is applied in that area. There is also slight tenderness over the lumbar vertebra down to the 5th lumbar vertebra. No muscle spasm was detected in the paravertebral muscles at lumbar level. There was some restriction of lumbar flexion with the patient able to flex his spine and hips so that his fingertips were 8" to 10" from the floor. There was some resistance to extension of the spine. The patient complained of pain on lateral bending in either direction. There was a complete range of hip motion. The legs were of equal length. The patient complained of discomfort in his back on straight leg raising at 95 bilaterally. Tendon reflexes of the legs were active and physiological. No impairment of skin sensation was noted in the legs.

*364 "Several sets of X-rays which had been taken at Our Lady of the Lake Sanitarium were reviewed. The first X-rays taken on February 16, 1953 show a rather marked compression deformity of the 12th dorsal vertebra. X-rays taken on February 24, 1953, show that the patient is in a cast, and show excellent expansion of the previously compressed vertebral bodies. The disc spaces were well preserved on these X-rays. X-rays taken on June 11, 1953, show that there has been some recurrence of the deformity with the residual wedging compression being present in the 12th dorsal vertebra. There was some bone condensation present which indicated some bony healing at that time. As no X-rays had been taken since June 11, 1953, it was felt advisable to have additional films made. These were taken at Our Lady of the Lake Sanitarium on December 8, 1953. These X-rays showed once again the wedged shaped deformity that had been seen in June 1953. There is noted a lipping or beaking involving the inferior anterior surface of the 11th dorsal vertebra. The disc spaces are well preserved. There is noted slight angulation or gibbous formation at the fracture site.
"Considering the nature of this fracture, it is my opinion that this patient has obtained a statisfactory result. However, he still has approximately 30% residual compression in the body of the 12th dorsal vertebra and has some spurring present at the inferior margin of the 11th dorsal vertebra. He has some restriction of active back motion. On the basis of these findings, it is my opinion that this patient has a partial disability which I would estimate at 15% on the basis of the body as a whole. It is possible that this disability may decrease with time as the patient may regain better motion in his back. However, I am very doubtful that this disability will ever decrease beyond 10% on the basis of the body as a whole."
This physician testified that the subjective symptoms of pain with which the plaintiff complained were compatible with the character of injury he received, but he definitely stated that any strenuous work, heavy work or heavy lifting would not cause any further injury to plaintiff's back but that he would be more susceptible to experience back pain but that he would not be, on account of the injury to his back, more susceptible to further injury; that he would not recommend the plaintiff for further employment if he was examining him for employment if he complained of pain in his back. This witness further observed some spurring, lipping and beaking reflected on the X-ray films subsequently developed after the fracture, and that the beaking, lipping or spurring are not reflected on the films first taken after the accident and that there are slight arthritic changes on the eleventh dorsal vertebra where it comes in contact with the twelfth dorsal vertebra.
Dr. Moss M. Bannerman, who attended plaintiff for his injuries throughout the entire period of his disability and who did the surgery on his disabled spine, testified that at the time of the commencement of his treatment the plaintiff had a rather severe compression of the first lumbar vertebra of his back, later corrected to be the twelfth dorsal vertebra, and he was hospitalized and the fracture treated by hyperextension and reduction. He discharged the plaintiff as having fully recovered on September 24, 1953. He had made progress reports to the insurance company and at the time of his last report it was his opinion that the plaintiff could do and perform his work. He estimated plaintiff's permanent total disability at 15%, but thought that within six months or a year he would have fully recovered to where he would not have any disability. The disability that he found the plaintiff suffering from was due on account of the muscles of the back having been immobilized for a considerable period of time of seven months, and that the 15% disability was based on the plaintiff's complaint of pain which "are primarily due to lack of use and some residual *365 weakness" plaintiff had not already gained because of non-use of his back, and that the deformity of the vertebra was within the normal limits compatible with good function. There is very minute restriction of motion in plaintiff's back and that the minute lipping, beaking would not in any way interfere with the function of plaintiff's spine and that the 15% disability with which the plaintiff suffers will all disappear completely with the resumption of normal activity within six months or a year. It is this physician's opinion that following an injury of the type suffered by the plaintiff after four months' treatment, the plaintiff should return to some normal activity which should be gradually increased over a period of time and that the only thing required in plaintiff's present condition is to acquire and regain more strength, which can only come from exercise and use.
The other two examining physicians' testimony is practically to the same effect.
The question to be determined is whether or not the plaintiff, at the time he refused to accept light work or the employer refused to give him light work, was able to do and perform the type of work he was doing at the time of the alleged accident. The lower court, in view of the finding that part of the work plaintiff was employed to do was of a strenuous nature, thought that he was totally disabled within the provisions of the Compensation Act, LSA-R.S. 23:1021 et seq., in view of the holding of the Supreme Court in the case of Brannon v. Zurich General Accident & Liability Insurance Co., 224 La. 161, 69 So.2d 1, and our holding in the case of Loflin v. Erectors & Riggers, La.App., 68 So.2d 694, and Strother v. Standard Accident Insurance Co., La.App., 63 So.2d 484. In each of the cited cases, the injury complained of was an injury to a limb. In the Strother case, it was to the plaintiff's leg, and there was also a leg injury in the case of Brannon. In the case of Loflin, he suffered a slight impairment of supination and pronation of the wrist joint at the ulna. The injury here is to the spine and not to a limb. We know that a person who works in the trade of digging post holes for light poles, riding on a truck and unloading poles and other equipment such as cross-arms, transformers, cables and spools of wire, does hard manual labor. The contention is made here that the work was light because all pieces of heavy material are lifted or moved by power appliances, but there are times when these power appliances cannot be used and a worker will have to apply his full strength to lift or assist in lifting and removing a piece of material. In cases of this kind, when the injury affects the body as a whole and not just one specific member of the body, they have to be viewed in the light of the worker's ability to do his job, and a worker with 10% impairment of the wrist, of an arm, or a 20% impairment of a leg cannot be compared with a disability of 15% or 20% in the back, because we know that a back injury of 15% would certainly be more disabling than a similar percentage of disability in the hand, arm or leg because it affects the entire body while the injuries referred to only affect the particular limb involved. It was pointed out by Justice McCaleb in the case of Morgan v. Bituminous Co., 217 La. 968, 47 So.2d 739, in his concurring opinion, which was approved and followed by the Supreme Court in Brannon v. Zurich, supra, that a 20% disability may have the effect of reducing a worker's earning power 75%. Therefore, a 5%, 10% or 15% back injury may reduce a laborer's earning capacity 75%. Total and permanent disability under the Compensation Law is not measured by the percentage of an injury producing disability.
The defendants insist here that we follow the ruling of the Supreme Court in the Morgan case. Our ruling here is consonant with the holding of the Court in that case as well as that of Wright v. National Surety Co., 221 La. 486, 59 So.2d 695; Brannon v. Zurich, supra.
We cannot say, from the evidence of Dr. Bannerman contained in the record, that the plaintiff was able to do and perform the work he was doing at the time his compensation payments were discontinued because this physician said that it would take six months or a year after the plaintiff resumed some form of work before his disabling *366 condition would disappear. The difficult proposition with which the Court is confronted in cases of this kind is that the employer or insurance company discontinues an injured employee's compensation before they actually get him back on the job to work. Now if the plaintiff had resumed light work to restore the usefulness of the muscles of his back and had been paid less compensation for his services, then we would have some evidence on which to base a judgment of partial disability. If he was able to earn the same wages as he earned before and doing the same kind of work, although he suffered an impairment of a physical function, he would be entitled to compensation for 100 weeks at whatever rate we should determine. That was our ruling in the case of Dronet v. American Mutual Liability Ins. Co., La.App., 69 So.2d 114, where an employee had suffered an injury to a cervical vertebra. If the injury and disability had been to an arm or a leg and did not affect the employee's earning power, then the percentage of impairment to the particular member would be used in computing the compensation due him. In those cases where courts have made an award based on the percentage of disability or judgments for partial disability, the evidence showed that the injured employee had recovered and had resumed his work or work of a similar character.
The appellee's contention that the penalties should be imposed in this case is not supported by the evidence because when plaintiff's compensation was discontinued the insurance company had a report from the attending physician that the plaintiff was able to resume his work as an electrician's helper. The testimony of the attending physician on the trial of the case was modified to the extent that it would be six months or a year before plaintiff would not have any disability in his back, and plaintiff's physician thought that it would never be below 10%. Under this evidence we believe the trial court was right in awarding plaintiff judgment for total disability without the penalities.
For the reasons assigned, the judgment appealed from is affirmed.