HOOD, Judge.
Plaintiff, Leo Paul Landry, sues for workmen’s compensation benefits, -alleging that he is totally and permanently disabled. The suit was instituted against his employer, Central Excavation Company, Inc., and its insurer, American Fire and Casualty Insurance Company. Judgment on the merits was rendered by the trial court in favor of defendants, and plaintiff has appealed.
The sole question presented on this appeal is whether plaintiff has been disabled since December 9, 1963, that being the date on which defendants discontinued paying compensation benefits to him.
The accident which gave rise to this suit occurred on October 3, 1962. Plaintiff at that time was working for defendant, Central Excavating Company, Inc., as an oiler on a dragline. His duties consisted of keeping the dragline clean, and in performing these duties it was necessary for him to crawl under and on the machine and frequently to jump from some part of it to the ground. While performing these duties on October 3, 1962, plaintiff’s right knee was struck by a marsh mat, causing injuries to his right hip and right knee. He acknowledges that the injury to his hip cleared up within a few weeks, but he contends that the injury to his knee was much more serious, and that because of it he has been disabled continuously since the date of the accident.
Plaintiff testified that he has suffered severe pain in his knee almost continuously since the date of the accident. He concedes that he returned to work a little less than two months after the injury was sustained and that he has continued to work with very little interruption since that time, but he stated that he has worked because he needed the money and he did so in spite of the fact that his leg was stiff and he was in pain. He described his pain as being “pain that I can’t stand,” or pain similar to a real hard “pinch,” or at times the degree of pain which accompanies a sprained ankle.
The evidence shows that immediately after the accident occurred, plaintiff was examined and treated by Dr. Edgar P. Breaux, a general surgeon. He remained under Dr. Breaux’s treatment for about seven weeks. On November 28, 1962, he returned to work for defendant, Central Excavation Company, performing the same duties at the same rate of pay, and he continued to work for that company until' March, 1963, when he was discharged. In April, 1963, he returned to Dr. Breaux with complaints of weakness in his knee,, and Dr. Breaux referred him to Dr. Guy J. Dunning, Jr., an orthopedic surgeon. He was treated by Dr. Dunning for several months thereafter. In May, 1963, while being treated by Dr. Dunning, Landry obtained employment with Grisby Brothers as a plastic welder’s helper, and he remained in that employment until January, 1964. Approximately one week later he began working for Pelican Well Service as a “floor hand” on a drilling rig, and he continued on that job until March 10, 1964, when he was involved in an accident which disabled him for more than two months, until May IS, 1964. He received compensation benefits from Pelican during this period of disability. Defendants in this suit, of course, were not in any way responsible for that accident or injury. On May 15, 1964, plaintiff returned to work for Pelican at the same job, and he continued to work for them for about two months. Since July, 1964, he has worked for Grisby Brothers, working offshore as a painter of rigs at an increase in salary. He was still in that employment at the time of the trial of this suit.
On February 3, 1963, plaintiff voluntarily enlisted as a chief radio operator ini *573 the Marine Infantry Reserve Company, in Lafayette, and he remained in that military unit until July, 1964, when he resigned because he had accepted employment on an offshore rig and would not be able to attend the drills. • While in this Marine Reserve unit he regularly attended monthly drills of two days each, performed calisthenics and engaged in hikes, marches and military maneuvers. In the summer of 1963 he attended a two-weeks camp in North Carolina, at which time he participated in maneuvers and in a twenty-mile hike. The captain of this military unit, and the major who served as inspector-instructor of it, testified that plaintiff had passed a physical examination before entering this service, that he performed all of the duties, that he did not complain of his knee, and that while in this reserve unit he voluntarily requested and was granted a change of classification so that thereafter he was rated as ready for combat. The commanding officer of the unit described the calisthenics which were performed as involving much squatting, standing, kicking and use of the legs.
Landry was paid workmen’s compensation benefits at the maximum rate from the date of the accident until November 28, 1962, when he returned to work for the same employer performing the same type of work. His compensation payments were resumed as of April 16, 1963, after he left the employment of defendant, and were continued until December 9, 1963.
Dr. Breaux diagnosed plaintiff’s injuries as “a contusion of the right hip, and a moderately severe contusion and abrasion of the right knee with a hemarthrosis.” He treated plaintiff for several weeks, and then reported that he had recovered from his injuries and that “He was able to return to work on November 22, 1962.” Dr. Breaux stated that Landry returned to him on April 16, 1963, with the complaint that his leg had given out on him and that he had weakness of the right thigh muscles. He did not examine plaintiff on that occasion, but he did refer him to Dr. Dunning, an orthopedic surgeon, and he has not seen or treated plaintiff since that time.
Dr. Dunning first saw plaintiff on April 23, 1963, and on that initial examination he found a slight synovial thickening, and a one and one-half inch atrophy of the right thigh. He concluded that Landry had a “quadriceps weakness of the right thigh secondary to previous trauma,” and he recommended that plaintiff undergo physiotherapy treatments. The treatments so recommended were administered thereafter by a qualified physiotherapist. Dr. Dunning examined and treated Landry periodically thereafter. On September 10, 1963, he found that there was no longer any syno-vial thickening, that there was no pain with motion, and that plaintiff’s quadriceps had improved. He recommended that plaintiff continue the physical therapy treatments for two more weeks. Plaintiff received some physiotherapy treatments after that date, but he did not return to Dr. Dunning for further examination until several months later, on April 7, 1964. As a result of the examination made by Dr. Dunning at that time, the doctor concluded that plaintiff had recovered from his injuries and was able to return to work. In connection with that examination, however, Dr. Dunning reviewed the reports of the physiotherapist and found from those reports that by October 11, 1963, plaintiff actually had reached the point in his recovery which Dr. Dunning found to exist on April 7, 1964. He reasoned, therefore, that plaintiff had recovered and was able to return to work in October, 1963.
X-rays made by Dr. Dunning on April 7, 1964, revealed for the first time that plaintiff had osteochondritis of the right knee. Dr. Dunning stated that this condition is developmental in origin and is not usually caused by single trauma. He was of the opinion, however, that plaintiff could return to work and could perform heavy labor in spite of the osteochondritis. He testified that “although he has some discomfort at times, I feel that he is able to carry out his work.”
*574 Dr. Isaac L. George, an orthopedic surgeon, examined plaintiff once, and that was on January 9, 1964. He concluded that plaintiff had “a tear of the medial semi-lunar cartilage, and minimal hypertrophic 'changes of the lateral side of his right knee.” Dr. Dunning found no such condition. Dr. George was “reasonably sure” that he had taken x-rays of plaintiff’s knee, .but he had lost his files and could not be certain of that fact. He testified that in •his opinion plaintiff was disabled at the time of that examination because he would ■suffer pain while he worked. Using Mc-.B ride’s Formulary, he estimated that plaintiff had a 26 percent disability of the knee. He testified, however, that he thought that plaintiff “had a good prognosis, he would •probably get over it in a certain period of time.”
We agree with the trial judge that the medical evidence preponderates to the effect that plaintiff had recovered by the time the payment of compensation benefits to him was discontinued. We find considerable merit to the trial judge’s conclusion that there is no conflict in the medical testimony, and that the lay testimony thus should not be considered. We have decided, however, that there is sufficient conflict in the medical testimony to warrant :a consideration of the lay evidence.
As lay witnesses, plaintiff called his -mother and three men with whom he had worked. One of the latter has not worked with him since the accident occurred, and lie has never seen plaintiff manifest any evidence of knee injury since that time. 'The other two fellow workers have worked with plaintiff since the accident occurred, and their testimony strongly supports plaintiff’s to the effect that there has been •swelling in his knee, that his leg has been ■stiff on occasions, that he has limped and that he has complained of pain while he worked. Each stated, however, that he performed all of the duties of his employment after the accident. Plaintiff’s own testimony, and that of his mother, also is to the effect that his knee swells frequently, requiring the application of hot packs, and that his leg frequently gets stiff and pains him.
Defendants, on the other hand, called two men with whom plaintiff had worked after the accident. One of these men, John Houston, is plaintiff’s brother-in-law, and he was the operator of the dragline on which plaintiff was working when he was injured. Houston worked with plaintiff for three or four months after the injury occurred. He testified that after plaintiff returned to work following the accident he did not limp, he performed all of his duties as an oiler for the dragline and he did not complain of his knee except on two or three occasions “when he bumped his knee.” The other former co-employee who testified was working as a safety representative for defendant Central Excavating Company when plaintiff was injured and when he returned to work later. This employee has since been fired and is no longer working for that defendant. He testified that he received no complaints from plaintiff or from anyone else relating to plaintiff’s knee, although as safety representative he should have been the first to hear of any difficulty he was having with his knee. Pie also testified that he observed plaintiff twice and did not see him limp or give any indication of a leg injury.
We have already discussed the lay evidence relating to the various types of employment in which plaintiff has engaged since the accident occurred, and relating to his enlistment and service in a Marine Corps Reserve Company for over a year. The testimony of the commanding officer of that unit and the inspector-instructor of it is convincing to the effect that during the period of that enlistment the condition of plaintiff’s knee did not prevent him from engaging in the strenuous calisthenics and other activities of that unit.
We consider the lay evidence, as well as the medical testimony, to preponderate to the effect that plaintiff has not been disabled since December 9, 1963.
*575 The trial judge, after analyzing all of the evidence in his excellent reasons for judgment, concluded:
“ * * * that plaintiff’s knee probably troubles him at times but, in the Court’s opinion, plaintiff has failed to show ‘substantial pain’ in performing his job. Additionally, it is difficult for the Court to believe that the pain or discomfort in plaintiff’s right knee is substantial in view of the fact that plaintiff has been engaged almost consistently since June or July 1963 in numerous, hard, hazardous occupations, in addition to voluntarily joining the Marine Reserves and being classified physically as ‘combat ready’. The Court believes that the plaintiff has failed the test of showing substantial pain as is required by the jurisprudence.”
Under our jurisprudence, a compensation claimant will not be held to be disabled and thus entitled to compensation benefits solely because he suffers some residual pain or discomfort when he attempts to work following a work-connected accident. The residual pain or discomfort in such a situation will be considered as being disabling only if it is substantial or appreciable pain. It must be substantial enough to be disabling in that it either prevents the worker from carrying out some of the functions of his job or, where the pain is not so intense as to hinder the worker’s fulfillment of his duties, it must be shown that the performance of the work would be deleterious to his health. Glidden v. Alexandria Concrete Company, 242 La. 625, 626, 137 So.2d 894 (1962); Loflin v. Erectors and Riggers, Inc., 68 So.2d 694 (La.App. 1st Cir. 1953); Moreau v. Employers Liability Assurance Corp., Ltd., 180 So.2d 835 (La.App. 3d Cir. 1965); and Ragusa v. Aetna Casualty and Surety Company, 190 So.2d 122 (La.App. 4th Cir. 1966).
After reviewing the facts and the applicable law, our conclusion is that the judgment appealed from is correct. We-agree with the trial j'udge that plaintiff has failed to establish that he has been' disabled since December 9, 1963, that being" the date on which the payment of compensation benefits to him was discontinued..
For the reasons herein set out, the j'udgment appealed from is affirmed'. The-costs of this appeal are assessed to plain^tiff-appellant.
Affirmed.